**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert A. WOODRING,
Defendant-Appellant.**

No. 75–3872.

United States Court of Appeals,
Fifth Circuit.

Aug. 4, 1976.
Rehearing Denied Aug. 30, 1976.

Ray Sandstrom, Fred Haddad, Ft. Lauderdale, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Barbara Schwartz, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before DYER, SIMPSON and RONEY, Circuit Judges.

SIMPSON, Circuit Judge:

Woodring was found guilty by a district court jury of violating Title 18, U.S.C., Section 2232.[1] From his ensuing judgment of conviction and sentence to ten months confinement, he took this appeal. We affirm.

On January 14, 1975, at approximately 3:30 P.M., Special Agents Robert Moore and

---

1. Title 18, U.S.C., Section 2232, provides:

   "Whoever, before, during, or after seizure of any property by any person authorized to make searches and seizures, in order to prevent the seizure or securing of any goods, wares, or merchandise by such person, staves, breaks, throws overboard, destroys, or removes the same, shall be fined not more than $2,000 or imprisoned not more than one year, or both."

Thomas Williams of the Office of Investigation, U. S. Customs Service, arrived at Baker's Haulover Inlet in the northerly portion of Biscayne Bay, Dade County, Florida, with the intention of placing the 60 foot Pacemaker twin-screw motor yacht "Gemini" under constructive seizure.[2] The "Gemini" was known to the officers to be under British Registry. Seizure had been authorized by the Office of Investigation of the United States Customs Service.

As the agents arrived, the yacht was heading southbound, toward the inlet. In an unmarked 30-plus foot motor boat, white in color, borrowed on the spot from the Dade County Public Safety Department, the Customs agents, accompanied by two Dade County Public Safety Officers, one of whom was in uniform, gave chase. Neither of the Customs' agents was in uniform.

As the "Gemini" cleared the inlet and entered the open Atlantic Ocean, the chase boat accelerated and came within 75 feet of the yacht. At that point the uniformed police officer, Mr. Albrecht, stepped on the bow of the police boat and motioned for appellant, who was piloting the yacht, to stop. Woodring did not stop; instead he continued out to sea on a course of about 100 degrees, or slightly south of due east.

The chase boat's radio call for assistance resulted in the appearance within about 20 minutes of a Dade County Police helicopter, with the words "POLICE" printed in large letters on its pontoons. The police boat was then about 100 yards astern of the yacht, and Mr. Moore testified that the helicopter circled numerous times within 20 to 30 feet of the yacht attempting to communicate with those aboard, using sirens and a public address system. A second helicopter, belonging to the United States Coast Guard, arrived somewhat later and circled over and near the "Gemini", remaining at a higher elevation than the police helicopter.

The Coast Guard cutter "Cape Knox" was soon afterward dispatched to the location.

Headwinds and four to eight foot seas prevented the cutter from approaching closer than about two miles from the "Gemini", but "Cape Knox" made radio contact with the yacht and several times told Woodring to "Heave to" (stop) for a Customs' boarding. Woodring refused to stop. He testified that he believed that he was not required to do so because he was by then in international waters. He also testified that he did not know the identity of his pursuers or that they were officers, and that as he was alone on the "Gemini", he was fearful of harm to his vessel or his person. At nightfall the chase was abandoned. The appellant was arrested three days later, on January 17, on a Magistrate's warrant from the Southern District of Florida. The seizure of the "Gemini" was never effected.

The appellant raises two issues on appeal: (1) that the evidence was not sufficient to submit to the jury the question of his knowledge of a lawful attempt to seize the yacht; and (2) that the court committed prejudicial error in allowing the government to raise an issue as to "hot pursuit" by testimony from Coast Guard quartermaster first class Townsend who related a radio conversation with the "Gemini" during the chase.

As to (2) the appellant contends in the alternative that the trial court erred when it refused to admonish the jury to disregard the testimony as to "hot pursuit" or to instruct the jury regarding that concept.

■ The first issue raised is without arguable merit. Despite Woodring's testimony to the contrary, his knowledge of the Customs official's intent to seize the "Gemini" was clearly a reasonable inference from the factual showing on the record of the numerous attempts to halt the vessel and official demands for him to stop. The evidence exceeded by far the proof required under the test set out in *Glasser v. United States,* 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704. *United States v.*

---

**2.** Constructive seizure was defined by Special Agent Moore as "advising the person that the boat is under seizure and [he] cannot leave with the boat. And it relieves us [United States Customs Service] from the physical responsibility of taking the boat and storing it and docking it and incurring all those expenses". Trial Transcript, p. 8.

*Warner,* 5 Cir. 1971, 441 F.2d 821, contains this Circuit's enunciation of the applicable standard of review:

> "[T]he test is whether, taking the view most favorable to the Government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. (citing cases)." *Id.* at 825.

See also, e. g., *United States v. Amato,* 5 Cir. 1974, 495 F.2d 545; *United States v. Edwards,* 5 Cir. 1974, 488 F.2d 1154; *United States v. Fontenot,* 5 Cir. 1974, 483 F.2d 315.

Appellant was several times ordered to stop his vessel, by signals from the uniformed police officer on the Dade County chase boat, by the marked "POLICE" helicopter hovering nearby and attempting to communicate by its public address system and by using a siren, by radio communications from a Coast Guard cutter specifically directing a stop for Customs' boarding, and by the answer from the Miami Coast Guard station to his call. Woodring told Mr. Townsend, the Miami Coast Guard dispatcher, that "[h]e believed that the Coast Guard and Customs Service were being used to secure a lien on his vessel of some kind." This single statement of Woodring's standing alone warranted the jury in concluding that he knew that he was being directed by the proper authorities to "heave to" and permit boarding. Resistance to such authority by self-help is not recognized in courts of law. *United States v. Ferrone,* 3 Cir. 1971, 438 F.2d 381.

■ Appellant's awareness of a lawful attempt to seize the "Gemini", and the proof of his intent requisite to convict under Title 18, U.S.C., Section 2232, were questions for jury resolution. See the statement, *United States v. Gibbons,* D.Del. 1971, 331 F.Supp. 970, 972, that "in order to obtain a conviction under Section 2232, a jury must find an intent to do the act charged."

As to the second point raised on appeal, it is correct that no definition of "hot pursuit" was given to the jury. It was never really an issue in the case.

The matter arose as a result of the testimony of Quartermaster First Class Townsend, the dispatcher on duty at the Miami Coast Guard Station, who related that he dispatched the cutter "Cape Knox" and a Coast Guard helicopter to the scene of the chase. During the pursuit Woodring called the Miami Coast Guard Station by radio [3] on the Marine operator's circuit and asked "Why is this Coast Guard aircraft buzzing me?" Townsend responded by instructing Woodring to "heave to" for a Customs boarding. Woodring stated to Townsend that he believed the Coast Guard and Customs Service were being used to serve a lien of some kind on his vessel. When Townsend told him that the Coast Guard was assisting Customs in a boarding of his vessel, Woodring indicated his belief that he was outside United States territorial waters. Townsend testified that he then "went into some length to explain to him the doctrine of hot pursuit", advising "that the Coast Guard had a right under the doctrine of hot pursuit and to more or less stop his vessel". After the trial judge explained to the jury that the statement regarding the right of pursuit was not offered for the truth of the contents, but only as proof of the contents of the conversation, and also that the jury would later be instructed as to the meaning of "hot pursuit", the judge permitted Townsend to testify further:

> "I explained to him that the Customs limit was approximately 12 miles offshore, that the Coast Guard and other authorities had begun chasing his vessel inside that limit and they could carry this hot pursuit over the high seas. That, briefly, is it in a nutshell."

According to Townsend, Woodring then thanked him and broke off the conversation. He also said Woodring thereafter

---

**3.** After first contacting, according to him and to Townsend, the Ft. Lauderdale Coast Guard Station.

failed to respond to several further attempts to raise him by radio, both over the Marine operator's circuit, "the radio telephone circuit, the distress circuit, and so forth".

The trial judge did not, as he had earlier indicated he would, define "hot pursuit" in his instructions to the jury. Instead he told the jury to "disregard any reference to hot pursuit".[4] This was correct, as hot pursuit was in no way involved in the violation charged, to-wit, removal of property to prevent seizure. It was completely extraneous to the offense charged. Possible prejudice to the appellant from such testimony, if any, was vitiated by the instruction given. *Heinz v. Lehigh Valley Railroad Co.,* E.D.Pa.1972, 344 F.Supp. 1131, 1132.

AFFIRMED.

4. The instruction was: "I instruct you that hot pursuit does not have a place in the issues for you to resolve or in the facts for you to consider; therefore, I am asking you to disregard completely any reference to hot pursuit as might have been described by one of the witnesses yesterday." Trial Transcript, p. 251–252.