568 P.2d 1040
**STATE of Arizona, Appellee,**
v.
**John Richard HATTON, Appellant.**
**No. 3405.**
Supreme Court of Arizona,
In Banc.
July 6, 1977.

Bruce E. Babbitt, Atty. Gen., by William J. Schafer III, Chief Counsel, Galen H. Wilkes, Asst. Atty. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender, by Michael G. Sullivan, Deputy Public Defender, Phoenix, for appellant.

STRUCKMEYER, Vice Chief Justice.

John Richard Hatton was convicted of two counts of first degree murder and sentenced to life imprisonment on each count. He appeals. Judgments affirmed.

On the evening of November 6, 1974, appellant and his wife played cards and drank at their neighbors' Canlen House apartment until about midnight. He then went to the Yucca Tavern, a local bar, taking along a .38 caliber handgun. After the bar closed, appellant met two boys at a Shop N Go store near his home and stopped to talk with them. Later he was seen with them behind a nearby laundromat at about 1:30 a. m. Around 1:45 a. m., he was seen entering and leaving his apartment carrying a bundle which, according to the witness, could have been clothing.

At about 5:00 a. m. of the morning of November 7th, after a telephone call from appellant's wife, two Tempe policemen

went to the Canlen House Apartments. Appellant met the officers when they arrived. He directed them to a bathhouse where they found the nude bodies of two 12-year-old boys. Both had been shot in the head at some time in the early morning hours, probably between 1:30 a. m. and 2:00 a. m. One of the victims was still alive, but died three hours later.

At about 6:30 a. m., Officer John Hahn of the Tempe police, an investigating officer on the case, talked extensively to appellant in his apartment. Although appellant had consumed considerable alcohol over the previous ten hours, the record does not show it substantially impaired his faculties. After talking with appellant, the officer asked him for his clothes and shoes with which to make certain tests. Appellant became angry, refused to give him his shoes, and insisted that the police get a search warrant. When the police attempted to execute a warrant for the search of appellant's automobile, he refused to permit the search and it became necessary to place him under arrest for obstructing justice. A few weeks after appellant's release from jail on the charge of obstructing justice, he went to Chicago and was in Chicago when the Tempe police called him and told him he had been indicted for murder and asked him to surrender to the Chicago police. Instead, appellant went to Florida, from which state he was eventually returned to Arizona.

As we view the record, on some fifteen occasions in Arizona appellant made statements which concerned the homicides, and on five occasions he discussed at least some of the facts with the Florida police. He contends that all of his conversations with the Tempe and Florida police should have been suppressed.

Appellant does not point to the exact matters, except in a few particulars, which he feels should have been suppressed. Those which might have had some effect on the jury's verdict are: Appellant admitted that he had seen and talked with the victims at a Shop N Go store early in the morning of November 7th and he acknowledged that he had had a .38 at the Yucca

Tavern. A number of inconsistent statements regarding the gun were made by him. Very damaging was a statement to the Florida police that he did not want to be incarcerated at the county jail, because "if they found out what he did someone would kill him."

Appellant first was questioned at the scene of the homicides concerning the circumstances surrounding his finding the bodies of the two boys. Thereafter, at about 6:30 a. m., Officer Hahn of the Tempe police talked to appellant in his apartment. At that time the police considered appellant as a suspect in the case. He was asked to relate to the officers what he had done on the evening of November 6, 1974 and the morning of November 7th until he found the two murdered youths. The questioning took place in appellant's apartment in a relatively congenial atmosphere with his wife, children, and one other policeman present. One policeman previously on the scene indicated to appellant that he was suspected, and Officer Hahn acknowledged that he had sought to obtain incriminating statements from him. However, though it is not dispositive of whether the appellant was in custody, a short time before the questioning the Tempe police officer who had been assigned to keep him under surveillance made it clear to appellant that he was free to come and go as he pleased, although he would be followed.

Miranda warnings become a requirement only when a defendant is in custody or in fact is not free to leave the place of interrogation. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). We do not find that there was here a "custodial interrogation."

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966).

The test is: would a reasonable man feel that he was deprived of his freedom of action in any significant way. *See United States v. Bekowies,* 432 F.2d 8 (9th Cir. 1970); *United States v. Hall,* 421 F.2d 540 (2d Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970); *Lowe v. United States,* 407 F.2d 1391 (9th Cir. 1969); *People v. Arnold,* 66 Cal.2d 438, 58 Cal.Rptr. 115, 426 P.2d 515 (1967). After examining the evidence, we do not think a reasonable man would have believed he was deprived of his freedom in any significant way.

■■■ While it is true that the United States Supreme Court has determined that there are circumstances in which a person not under arrest who is interrogated in his own home may be in custody, *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), generally, interrogating a person in his home is not the type of atmosphere to be held of questionable validity. *See McMillian v. United States,* 399 F.2d 478 (5th Cir. 1968). Further, the questioning was still investigatory rather than accusatory. That appellant was a suspect or that the investigation had focused on him when he was questioned does not alone establish custodial interrogation. *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *State v. Bainch,* 109 Ariz. 77, 505 P.2d 248 (1973). The element of deprivation of freedom of action must be present.

After appellant was questioned, the police withdrew and returned at about 9:00 a. m. with a search warrant for his apartment and his automobile. Appellant did not object to the search of his apartment, but so strenuously resisted the search of his automobile that he was placed under arrest for obstructing justice. At that time he was read his *Miranda* rights. After he was read his *Miranda* rights, he indicated he did not want to discuss the crime further. But about five hours later the police brought him out of his jail cell to talk with him. He was again advised of his *Miranda* rights and at that time he related again the facts of what had happened the night before substantially as he had told the police at his home earlier in the day. He added a few more details to his story and there were some discrepancies between this and his earlier statement. After he told the police that he did not want to talk about the matter any more, the police immediately ceased any further questioning:

■■ While *Miranda* provides specifically that a custodial interrogation must cease when requested by a suspect, 384 U.S. at 445, 86 S.Ct. at 1612, 16 L.Ed.2d at 707, in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), it was held that *Miranda* cannot be read to "create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject." *Id.* at 102–03, 96 S.Ct. at 326, 46 L.Ed.2d at 321. Questioning is permissible as long as a suspect's right to cut off questioning is "scrupulously honored."

Appellant was returned to his cell at about 4:00 p. m. and no one talked to him until about 8:30 p. m. He was then brought from his cell and taken to an office where he was again reminded of his constitutional rights. He was then asked whether he would go through his story again. Appellant did so. Finally he indicated he did not want to go over it any more and asked to talk to a lawyer. This concluded the final interrogation while in custody in Arizona.

■■ We conclude that the record is clear that in the two instances where he discussed the offenses in the Tempe jail he did so freely and voluntarily, completely aware of his constitutional rights, and that his right to refuse questioning altogether was "scrupulously honored."

After appellant was released from custody and before he went to Chicago, he had a number of conversations with the police. None of them was under circumstances in which he was under any pressure to talk whatsoever. After he was indicted for the homicides and arrested in Florida, he was questioned five times by the Florida police. From our examination of the record made at a suppression hearing, in each instance he was fully advised of his rights and freely and voluntarily entered into discussions with them.

Appellant contends that he had a right to resist the execution of the warrant for the search of his automobile because it was later found to have been illegally issued. He argues that therefore his arrest was illegal and any statements which he made subsequent to his arrest were the fruits of the illegal search and should have been suppressed.

Appellant relies on the statement to be found in *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948):

> "One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases."
> *Id.* at 594, 68 S.Ct. at 228, 92 L.Ed. at 220.

The reliance by appellant on this principle raises the question whether the right to resist arrest means that there is also a right to resist an unlawful search warrant.

■ The traditional common law rule has been that a person has a right to resist an unlawful arrest short of killing the arresting officer. *Dugan v. State,* 54 Ariz. 247, 94 P.2d 873 (1939); *State v. DeRoss,* 9 Ariz. App. 497, 454 P.2d 167 (1969); *State v. Robinson,* 6 Ariz.App. 424, 433 P.2d 75 (1967); *United States v. Moore,* 483 F.2d 1361 (9th Cir. 1973); *see Platt v. Greenwood,* 50 Ariz. 158, 69 P.2d 1032 (1937). But the trend is away from the old rule and toward settlement of such disputes in court. *State v. Lockner,* 20 Ariz.App. 367, 513 P.2d 374 (1973); *United States ex rel. Kilheffer v. Plowfield,* 409 F.Supp. 677 (E.D.Pa.1976); *People v. Burns,* 198 Cal.App.2d Supp. 839, 18 Cal.Rptr. 921 (1962); *State v. Koonce,* 89 N.J.Super. 169, 214 A.2d 428 (1965); *Columbus v. Fraley,* 41 Ohio St.2d 173, 324 N.E.2d 735, *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *State v. Ramsdell,* 109 R.I. 320, 285 A.2d 399 (1971); Model Penal Code, § 3.04; Uniform Arrest Act, § 5; *see State v. Briggs,* 435 S.W.2d 361 (Mo.1968); *Commonwealth v. Beam,* 227 Pa. Super. 293, 324 A.2d 549 (1974).

The common law rule allowing persons to resist unlawful arrest arose under circumstances significantly different from those existing today.

"The law of arrest by peace officers illustrates the discrepancy between law in the books and the law in action. The former not only antedates the modern police department, but was developed largely during a period when most arrests were made by private citizens, when bail for felonies was usually unattainable, and when years might pass before the royal judges arrived for jail delivery. Further, conditions in the English jails were then such that a prisoner had an excellent chance of dying of disease before trial. * * *

> * * * * * *

* * * The rule developed when long imprisonment, often without the opportunity of bail, "goal [sic] fever," physical torture, and other great dangers were to be apprehended from arrest, whether legal or illegal. * * *

When the law of arrest developed, resistance to an arrest by a peace officer did not involve the serious dangers it does today. Constables and watchmen were armed only with staves and swords, and the person to be apprehended might successfully hold them off with his own weapon and thus escape." Warner, *The Uniform Arrest Act,* 28 Va.L.Rev. 315, 315, 330 (1942).

Moreover, the right to resist developed when the procedural safeguards which exist today were unknown.

"One who suffers the imposition of an unlawful police search has the assurance that any evidence so acquired is rendered inadmissible in a subsequent criminal trial by the exclusionary rule. Likewise any incriminating evidence obtained by exploiting an illegal arrest will be excluded in a subsequent criminal trial. [citation omitted] And in any event damage remedies are available in the federal courts for violations of constitutional rights stemming from either an unlawful search or arrest." *United States ex rel Kilheffer v. Plowfield,* 409 F.Supp. 677, 680–81 (E.D.Pa.1976).

If resistance to an arrest or a search made under the color of law is allowed,

violence is not only invited but can be expected. See, e. g., *State v. Lockner*, 20 Ariz.App. 367, 513 P.2d 374 (1973) (dictum); *United States v. Ferrone*, 438 F.2d 381 (3d Cir.), *cert. denied*, 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971); *United States ex rel. Kilheffer v. Plowfield, supra; Columbus v. Fraley*, 41 Ohio St.2d 173, 324 N.E.2d 735, *cert. denied*, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *Commonwealth v. Beam*, 227 Pa.Super. 293, 324 A.2d 549 (1974). Self-help exposes both the officer and suspect to graver consequences than an unlawful arrest. *State v. Ramsdell*, 109 R.I. 320, 285 A.2d 399 (1971).

The Third Circuit commented in *United States v. Ferrone*, supra:

"Society has an interest in securing for its members the right to be free from unreasonable searches and seizures. Society also has an interest, however, in the orderly settlement of disputes between citizens and their government; it has an especially strong interest in minimizing the use of violent self-help in the resolution of those disputes." 438 F.2d at 390.

In *State v. Koonce*, supra, the court expressed the unacceptability of a blanket right to resist unlawful arrest:

"Force begets force, and escalation into bloodshed is a frequent probability. The right or wrong of an arrest is often a matter of close debate as to which even lawyers and judges may differ. In this era of constantly expanding legal protections of the rights of the accused in criminal proceedings, one deeming himself illegally arrested can reasonably be asked to submit peaceably to arrest by a police officer, and to take recourse in his legal remedies for regaining his liberty and defending the ensuing prosecution against him. At the same time, police officers attempting in good faith, although mistakenly, to perform their duties in effecting an arrest should be relieved of the threat of physical harm at the hands of the arrestee." 89 N.J.Super. at 183–84, 214 A.2d 436.

We likewise question a blanket right to resist arrest.

A.R.S. § 13–541(A) provides that:

"A person who attempts by means of any threat or violence to deter or prevent a public officer from performing any duty imposed upon the officer by law, or who wilfully resists, delays or obstructs a public officer in the discharge or attempt to discharge any duty of his office, or who knowingly resists by the use of force or violence the officer in the performance of his duty * * * *"

may be punished by imprisonment in the state prison for up to five years.

■ Appellant, citing *People v. Curtis*, 70 Cal.2d 347, 74 Cal.Rptr. 713, 450 P.2d 33 (1969), urges that he could not be arrested for resisting arrest or obstructing an officer because an officer is not discharging a duty of his office when he is executing an illegal search warrant. The better rule is expressed to the contrary in *United States v. Heliczer*, 373 F.2d 241 (2d Cir. 1967):

" 'Engaged in * * * performance of official duties' is simply acting within the scope of what the agent is employed to do. The test is whether the agent is acting within that compass or is engaging in a personal frolic of his own. It cannot be said that an agent who has made an arrest loses his official capacity if the arrest is subsequently adjudged to be unlawful." *Id.* at 245.

See also *United States v. Martinez*, 465 F.2d 79 (2d Cir. 1972).

■ Finally, even if there were a right to resist an unlawful arrest, we agree with those cases which hold that there is no similar right to resist a search warrant later found to be illegal. *United States v. Woodring*, 536 F.2d 598 (5th Cir. 1976); *United States v. Ferrone*, 438 F.2d 381 (3d Cir.), *cert. denied*, 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971). *Contra, United States v. Dentice*, 289 F.Supp. 799 (E.D. Wisc.1968).

■ Appellant next asserts error on the admission into evidence of two burned portions of a jacket. The admission arose in this manner: The mother of Jeffrey Schlosser, one of the deceased boys, testified that

when he left for school that morning he was wearing a yellow jacket with red stripes. She further testified that she did not see anything in a colored photograph of two burned pieces of yellow nylon material which would indicate that the pieces were not part of the yellow jacket with red stripes that Jeffrey was wearing the day before his death. She did not specifically identify the picture as depicting, or the pieces themselves as being part of, her son's jacket. The two pieces of yellow nylon material were found nearly three weeks after the murders on the curve of the ramp leaving the Superstition Freeway north onto the Interstate on which appellant was known to have traveled in his automobile early in the morning of November 7th. The police had, however, searched this same area looking for clothing without success on the day of the crime.

Appellant's position is that there was not an adequate foundation for the introduction of this testimony into evidence. He asserts that the burned items were not shown to have been the victim's and, further, it had not been shown how the items arrived where they were found, particularly in the light of the fact that the police did not find them on the day of the crime. We think, however, that there was an adequate foundation. Although the burned material could not be absolutely identified as the jacket belonging to Jeffrey Schlosser, it was very similar. The victims were found nude and some of their clothing was missing. A witness testified to seeing appellant during the early morning of the day of the crime carrying what could have been clothing. As stated, it was established that appellant drove on the off-ramp in the early morning hours after the time of the shooting. The burned material lends support to the theory that appellant took the victims' clothing in an attempt to dispose of evidence against him or possibly delay identification of the victims. See *State v. Loftis*, 89 Ariz. 403, 363 P.2d 585 (1961). Appellant places a great deal of emphasis upon the fact that a search on the day of the crime did not uncover the burned remnants of the jacket. However, it is pointed out that conceivably they could have been missed since the police were searching a large area. That the burned pieces of jacket were not a conclusive link in the case goes only to the weight and not to the admissibility of the evidence. *State v. Blazak*, 114 Ariz. 199, 560 P.2d 54 (1977); *State v. Brierly*, 109 Ariz. 310, 509 P.2d 203 (1973).

Appellant next urges that the trial court erred in not granting a mistrial because of certain insinuations made by the prosecuting attorney on his cross-examination. Appellant testified on direct examination that Officer Hahn called him in Chicago to inform him that he had been indicted and warned him that if he did not turn himself in to the police he "might get shot on sight." On cross-examination by the prosecution, the following occurred:

"Q. You're sure he said you'll get shot on sight?
A. I'm pretty sure, yes.
Q. Then you walked around Chicago in a disguise for a while, didn't you?
A. In a disguise?
Q. Yes?
A. No.
Q. You did not?
A. No."

The appellant does not say what the State was insinuating, but whatever adverse inference could have been drawn by the jury from this line of questioning, we are satisfied it was so trifling as to merit no further discussion.

Appellant next argues that the trial court erred when it granted the State's motion *in limine* to preclude witnesses from testifying about specific matters assertedly untrue that the witness Richard Bazzel had told on previous occasions. It is urged that their testimony should have been allowed in order to establish that Bazzel, who had been in the same cell in the Florida county jail with appellant, had a known history for lying.

In Arizona, an adverse party may impeach the character of a witness by testimony of other witnesses that his reputation

for truth and veracity is poor, *State ex rel. Pope v. Superior Court*, 113 Ariz. 22, 545 P.2d 946 (1976), but the use of character evidence to impeach a witness does not extend to showing specific prior bad acts less than a felony conviction. *State ex rel. Pope v. Superior Court*, supra; *State v. Brewer*, 110 Ariz. 12, 514 P.2d 1008 (1973). Specific past acts of a witness' untruthfulness may not be shown to suggest that the witness is presently lying. *State v. Miranda*, 104 Ariz. 174, 450 P.2d 364, *cert. denied*, 396 U.S. 868, 90 S.Ct. 140, 24 L.Ed.2d 122 (1969).

■ Appellant also urges that the testimony should have been allowed to establish a plan on the part of the witness to fabricate stories in order to gain a personal benefit. We think it is sufficient to say that counsel for appellant extensively cross-examined Bazzel as to any possible personal gain he might obtain from testifying for the prosecution.

■ It is argued that the trial court erred in not excluding testimony of three rebuttal witnesses for the State. Appellant's position here is that the State failed to disclose the identities of the rebuttal witnesses prior to trial, as is required by Rule 15.1(f) of the Rules of Criminal Procedure. The three were, however, listed as witnesses for the State's case-in-chief. Since the purpose of notifying a defendant of the witnesses before trial is to give counsel an opportunity to familiarize himself with the facts in the case, we think that listing the witnesses' names for use in the State's case-in-chief was adequate notice to the appellant to be prepared for their testimony at any time. *State v. Dillon*, 26 Ariz. App. 220, 547 P.2d 491 (1976). We hold that there was no error in this respect.

Appellant next claims the trial court erred in not ordering the disclosure of certain police reports. He had requested from the prosecution all police reports and other information regarding any disturbances during the year 1974 at the Canlen House Apartments and the rap sheets on any person or persons involved in such disturbances.

■ By Rule 15.1(a)(7) of the Rules of Criminal Procedure, the prosecution must make available to the defense:

"All material or information which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce his punishment therefor, including all prior felony convictions of witnesses whom the prosecutor expects to call at trial."

We have also held that the State has a duty to disclose evidence favorable to the defense which might not reasonably be known or discoverable by the defense. *State v. Salcido*, 109 Ariz. 380, 509 P.2d 1027 (1973). However, mere conjecture without more that certain information might be useful as exculpatory evidence is not sufficient to reverse a trial court's denial of a request for disclosure. *See State v. Reynolds*, 108 Ariz. 541, 503 P.2d 369 (1972). Discovery rules are not meant to be used for "fishing expeditions." *State ex rel. Corbin v. Superior Court*, 103 Ariz. 465, 445 P.2d 441 (1968). The suggestion that police reports of criminal activity in the area might disclose that a person other than appellant committed the homicides is the purest speculation.

■ The appellant's final claim of error is based on the instructions on reasonable doubt and flight as given by the trial court. He asserts that as to the instruction on reasonable doubt, the court failed to give any definition of what reasonable doubt is. We think the concept of reasonable doubt was adequately expressed when the jury was told:

"If after a careful and impartial consideration of all the evidence with your fellow jurors, you are not convinced that the defendant is guilty of killing Jeffrey Schlosser and Kelly Kardell, there exists a reasonable doubt  *  *  *."

■ Appellant objected to a flight instruction which, in effect, told the jury that it might consider evidence, if any, of the defendant's running away with other evidence to establish his guilt. It is urged that this is a comment on the evidence in violation of Art. VI, § 27 of the Arizona

Constitution, but appellant does not explain why he believes this is a comment on the evidence and we do not consider it as such. He also urges that a flight instruction is a legal anachronism and that this Court should seize the opportunity to "cleanse the case law of Arizona." We reject appellant's offer, being satisfied with the law as it presently exists. Neither do we think that the instruction is inconsistent with that approved by the Court in *State v. Owen*, 94 Ariz. 404, 385 P.2d 700 (1963), *vacated on other grounds*, 378 U.S. 574, 84 S.Ct. 1932, 12 L.Ed.2d 1041 (1964).

Judgments of conviction are affirmed.

CAMERON, C. J., HOLOHAN and GORDON, JJ., and ERNEST W. McFARLAND, Justice (Retired), concur.

Note: Justice JACK D. H. HAYS did not participate in the determination of this matter. Justice ERNEST W. McFARLAND (Retired) was called to sit in his stead.