**Thecia BROWN, Appellant,**

v.

**The CITY OF OKLAHOMA CITY, Oklahoma, and its Servants, Agents and Employees, Including, but not Limited to Officer W. Citty; and W. Citty and Others, Individually, Appellees.**

**No. 61122.**

Court of Appeals of Oklahoma, Division No. 4.

Feb. 4, 1986.

Rehearing Denied March 24, 1986.

Don Cooke, Miskovsky & Cooke, Oklahoma City, for appellant.

Walter M. Powell, Municipal Counselor, Richard E. Mahoney, Assistant Municipal Counselor, Oklahoma City, for appellees.

BRIGHTMIRE, Presiding Judge.

The determinative questions for resolution are these: (1) was the warrantless search of plaintiff's residential premises and seizure of her automobile unreasonable and therefore illegal? And, if so, (2) did plaintiff have a right to resist the wrongful seizure and ensuing arrest with reasonable force?

We answer both questions affirmatively and reverse the summary judgment rendered below.

I

The operative facts are embodied in the following stipulation of the parties:

"1. That on March the 6th, 1979, Officers Englebretsen and Citty received a radiogram from the Oklahoma City Police Department indicating that one Darrell Brown, a black male, 27 years of age, six feet one inch tall, and 175 pounds, possible address 4025 N.E. 19th and possible vehicle a 1975 Cadillac sedan two-door, tag 78 OK XR–1539, had committed the felony of defrauding an innkeeper at the Habana Inn in Oklahoma City....

2. That the radiogram directed the officers to place Allen [sic] Brown under arrest.

3. That on March the 6th, 1979, Officers Englebretsen and Citty went to the residence of Darrell Brown as set forth in the radiogram ... and observed a Cadillac backed into the garage with the garage door remaining open; that the car in the garage was a 1974 four-door Cadillac; that the officers walked into the garage to observe the tag and to match the tag listed in the radiogram.

4. That thereafter the officers went to the door of the residence and knocked; that the plaintiff herein, Thecia Brown, answered the door; that the officers inquired as to whether or not Darrell Brown was home whereupon they were advised by Mrs. Brown that he was not;

that the officers requested permission to search the home for his person and were refused by Mrs. Brown; that thereafter the officers advised Mrs. Brown that they were impounding the Cadillac in the garage for the reason that it was used in the commission of a felony; that Thecia Brown refused to give her permission to the officers to remove the car and asked the officers for some authoritative papers for the seizure of her car. That there was some discussion about the officers' authority to seize the Cadillac.

5. That at the time of entry upon Mrs. Brown's property the officers did not have a search warrant.

6. That the vehicle sought to be impounded was the property of Darrell and Thecia Brown.

7. That the officers called a wrecker service to remove the Cadillac from the garage; that in order to remove the Cadillac the other vehicle (Toyota) belonging to Thecia Brown must have been removed to reach and attach the Cadillac; that the officers requested Thecia Brown to remove her vehicle (Toyota) and she refused; that the officers ordered the wrecker service to remove the Toyota so that they could impound the Cadillac.

8. That Thecia Brown actively resisted and interfered with the removal and seizure of the Toyota and Cadillac at which time Thecia Brown was placed under arrest and that she resisted her arrest.

9. That Thecia Brown was booked into the City Jail and charged with interfering with official process, grabbed wrecker driver and officers."

The charges against plaintiff were later dismissed according to the petition and this action was brought to recover damages, both compensatory and punitive, for false arrest, false imprisonment, assault and battery, and malicious prosecution.[1]

---

**1.** She divides her petition into what she calls four causes of action. We think, however, there is but one cause of action pleaded and that is one for damages arising out of one factual situa-

The case came on for trial February 8, 1982. It was at that time the parties entered into the foregoing stipulation of facts and asked the court to judicially determine the lawfulness of the seizure on the basis of such facts. The thinking of the parties, according to defendants, was that under the agreed facts the validity of plaintiff's cause of action hinged on the answer to the following questions of law which were submitted to the court:

1. Did "the police officers ha[ve] the right to seize the [Cadillac] automobile?"
2. Did the police officers have the right "to arrest the plaintiff and to file charges against her for interfering with the police officer in the conduct of his official duties?"

The trial court apparently answered both of these questions affirmatively and rendered judgment in favor of defendants. An earlier appeal was dismissed by this court because it was premature.[2] Upon remand the defect was cured and this appeal was lodged.

## II

The first issue raised—whether the warrantless search of Brown's garage and the seizure of the Cadillac automobile located in it were constitutionally unreasonable and therefore unlawful—is answered in the affirmative.

■ Unreasonable searches and seizures of one's person, home or property are prohibited by both the Fourth Amendment of the United States Constitution and Article 2, § 30 of our state constitution—two identical provisions which the courts construe liberally in favor of the individual whose right of privacy they are designed to protect. *United States v. Lefkowitz*, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932). A warrantless search is "per se unreasonable." *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Case v. State*, 519 P.2d 523 (Okl.Cr. 1974). With regard to one's home the protection extends to the entire curtilage which includes, among other things, ga-

rages, sheds, barns and the like. *Luman v. State*, 629 P.2d 1275 (Okl.Cr.1981). "The right of the people to be secure in their ... houses ... shall not be violated," is the unequivocal Fourth Amendment command. It forms the foundation for a man's right "to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 682, 5 L.Ed.2d 734 (1961). And in "terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house," proclaimed the nation's highest tribunal in *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant," the court added.

■ Here there exists no fact or circumstance which furnishes a legal reason or probable cause for either the search or the seizure. The stipulated facts are that Oklahoma City Police Officers Englebretsen and Citty received a "radiogram" on March 6, 1979, "from the Oklahoma City Police Department indicating that one Darrell Brown ... had committed the felony of defrauding an innkeeper ... [and] directed the officers to place ... Brown under arrest." That is all they were directed to do—place Brown under arrest. Presumably to aid them in locating the suspect, the message mentioned a "possible address" where he might live and the description and tag number of a "possible vehicle"—a 1975 Cadillac two-door sedan. For while the relevance of the automobile information or its connection with the suspect or his contemplated apprehension was not disclosed in the radio dispatch, it is logical to conclude that the information was provided to aid in locating Brown and not for seizure of the vehicle. In any event we know for a fact the radiogram did not say the car was used or involved in the commission of any felony, or even that Darrell Brown owned it.

It is significant that the defending officers admit they drove to the given address

tion. Plaintiff seeks only a single remedy—damages—and the various tortious acts alleged all emanate from and were committed in the course of the occurrence complained of, namely, the wrongful search, seizure, and invasion of plaintiff's privacy. A good discussion of the

problem is in *Retherford v. Halliburton Co.*, 572 P.2d 966 (Okl.1977); *see also Mann v. State Farm Mutual Automobile Insurance Co.*, 669 P.2d 768 (Okl.1983).

**2.** *Brown v. City of Oklahoma City*, No. 58,228, decided August 2, 1983.

where from the street they saw the front end of a Cadillac protruding from an open garage in front of which was parked plaintiff's Toyota. Instead of first seeking a search warrant—which doubtless would have been denied—the officers invaded plaintiff's private property, proceeded to enter the garage and began a search by checking the tag number on the back of the Cadillac. Upon finding that the number matched the "possible vehicle" mentioned in the dispatch, the officers went to the house door, knocked, and inquired of Mrs. Brown about the presence of Darrell Brown. Upon being advised the suspect was not home and upon being refused permission to search the home for him the officers said they would seize the Cadillac because "it was used in the commission of a felony,"—an arbitrary act which could not have been accomplished by court order without an evidentiary hearing. And so, over the objection of Mrs. Brown, the officers called a wrecker and forsaking due process of law, proceeded to forcibly exercise dominion over her Toyota and her Cadillac.

Thus, it is that at this point subject question emerges—did the officers have a right to seize the vehicle? The trial judge concluded they did. His reasoning was that the information in the radio transmission provided the officers with "probable cause to search for and to arrest the suspect Darrell Brown" and once on his premises they had a right to carry out a search if they saw anything that "could be used [as evidence] in the trial of the suspect;" and that the officers "inadvertently discovered" the front end of a Cadillac in "plain view."

Although the judge conceded that "the automobile was probably not used in the commission of the offense," he "nevertheless [found that] it was valuable evidence in the commission of the crime."

The trouble with the trial judge's theory is two-fold. One, it is supported by neither facts nor law. He assumed facts not contained in the stipulation, e.g. that the Cadillac "was valuable evidence in the commission of the crime." And two, he ignored the fact that, even if it was, there is nothing in the stipulated facts to suggest that the officers did not have ample time to procure a search warrant. Certain it is the Cadillac was not committing any offense in the presence of the officers; nor had it defrauded an innkeeper and there was no evidence that the car had been involved in the commission of a crime. Sitting as it was in a garage, it cannot be said that the Cadillac could aid in either the apprehension or, as we have said, the conviction of the wanted suspect.

Quite the contrary, the stipulated facts suggest only an audacious and unrestrained intrusion onto the Browns' private domain far beyond the permissible front door inquiry. Crushed were the fundamental rights of a single protesting citizen beneath the grinding boot heel of uniformed government agents with all the cold callousness of an imperial executioner.[3] Nor did their armed aggression cease until the invaders had criminally assaulted and shackled the property owner, dispossessed her of her Toyota and her Cadillac, deprived her of her freedom, humiliated her and imprisoned her—all without due process of law.[4]

3. While it goes beyond the stipulated facts there is deposition evidence in the record that supports a finding of incredible oppressiveness on the part of the officers punctuated with an attitude that plaintiff was subhuman. For instance, when Mrs. Brown tried to find out what was going on and why her right of privacy had been disregarded, she was told to "shut up." She continued to press for an explanation while standing behind the Toyota between the two officers. Finally one grabbed her arm and twisted it behind her. The other grabbed the other arm and forced her toward the squad car. She refused to get in and while being crammed in by the policemen her brother came up. "Back that nigger off," barked one of the officers. Finally, after being forced into the police car Mrs. Brown expressed concern for her three little children in the house. "I asked him [the

officer]," she testified, "that [sic] I would speak to one of my family members to make some arrangements for my children, and one of the officers said he will call the animal shelter to call them up."
Then they took the mother away.
In the jail she was strip searched, abused and insulted before being released many hours later.

4. 21 O.S.1981 § 535 reads:
"Every public officer or person pretending to be a public officer, who under the pretense or color of any process or other legal authority, arrests any person, or detains him against his will, or seizes or levies upon any property, or dispossesses anyone of any lands or tenements without due and legal process, is guilty of a misdemeanor."

## III

We turn now to the second issue—whether plaintiff had a right to resist the unlawful invasion of her home and trespass on her Toyota car.

■ We conclude she did have. Though an attempt to prevent an unlawful seizure differs from resistance to a false arrest, the two actions are similar in nature and the right to do both has been upheld by our court of criminal appeals,[5] as well as the United States Supreme Court.[6] Moreover, one's right to disobey an unlawful command of a police officer has been recognized.[7] The refusal to cooperate in confiscatory acts of authorities and the resistance of such acts has long been recognized as one of the fundamental rights of the American people. The ravaging of colonists' homes by British officers furnished a major premise for the Declaration of Independence and later an important stimulus for our adoption of the Fourth Amendment. We shall therefore determine the scope of these rights and apply the controlling general principles to the factual situation presented here.

As early as 1710, English common law recognized the right of an individual to resist an unlawful arrest by a police officer so long as the resistance was reasonable and stopped short of killing him.[8] And likewise American common law has generally upheld a citizen's right to defy unlawful police action.[9] This is an inherent integrant of liberty. For certain it is that the keystone of the arch of freedom in this country is the legal concept that law enforcement officers are employed for the sole purpose of protecting the rights of citizens—not trampling them. In contrast to the average citizen, a police officer is or should be trained to understand and recognize the legal nature, extent and limits of his official authority. The privilege to pack a gun and wear a badge carries with it the concomitant obligation to be aware of and to observe the bounds of specifically circumscribed police enforcement authority and duties. Unless this principle is strictly adhered to, both individual as well as collective liberty is jeopardized; it soon withers to the point where the one who is supposed to be protected becomes the victim, the land of the free becomes a police state, and the home of the brave becomes the quarters of the enslaved.

As indicated earlier, the court of criminal appeals in this state, in line with the vast majority of jurisdictions,[10] has long recognized one's right to resist an illegal arrest. *Walters v. State*, 403 P.2d 267 (Okl.Cr. 1965); *Davis v. State*, 53 Okl.Cr. 411, 12 P.2d 555 (1932). A few jurisdictions in recent years have placed various restrictions on the common law right to resist a false arrest in situations where the arrestee knows the arrestor to be a law enforcement official performing his duty albeit illegally.[11] Various reasons have been advanced for limiting the common law right of resistance but the principal hypothesis is that force begets force, as one court put it, and "violence is not only invited but can be expected," as another court stated it.[12]

■ We do not, however, think this type of reasoning is sound. The existence of a right to resist should not depend on whether it is prudent for the individual to exercise it. If a law enforcer is engaged in the commission of a crime or is trespassing on one's person or property, it makes no sense to us that the rights of the victim of such unlawful acts should be less than those he has if the wrongdoer is not a police officer. To be sure it ordinarily would not be wise for the victim to resist too vigorously particularly if he suddenly finds himself look-

---

5. *See Billings v. State*, 14 Okl.Cr. 12, 166 P.2d 904 (1917), upholding right to resist unlawful seizure; and *Davis v. State*, 53 Okl.Cr. 411, 12 P.2d 555 (1932), acknowledging right to resist unlawful arrest.

6. *See, e.g., Bad Elk v. United States*, 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900).

7. *Wright v. Georgia*, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963), saying, "Obviously, however, one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution."

8. *The Queen v. Tooley*, 2 Ld.Raym. 1296, 92 Eng. Reprint 349 (1709).

9. *See* Annot., 44 A.L.R.3d 1078 (1972).

10. *Id.*

11. *Id.* at 1087–91. *See also* obiter dicta in *State v. Hatton*, 116 Ariz. 142, 568 P.2d 1040 (1977), a case involving resistance of an illegal search warrant—a materially distinguishing factor.

12. See excerpts from cases cited in *State v. Hatton*, 116 Ariz. 142, 568 P.2d 1040, 1045–46 (1977).

ing down the persuasive barrel of a .38 revolver. The same thing, for that matter, can be said with regard to exercising one's right to resist a mugger or hijacker. But should such right be forfeited because it might lead to violence and someone might get hurt? Surely not. The risk of harm in resisting a robber is not, in our view, a sensible reason for judicially declaring that one has no right to resist a criminal act. In regard to defying an armed police officer we find it hard to imagine circumstances in which we would attempt to exercise such right beyond perhaps verbal remonstration. For the sake of self-preservation due respect would surely be paid to a loaded firearm. But the alternative of denying the right, it seems to us, would create the potential for greater mischief—a license for unrestrained wielding of arbitrary power eventually degenerating into gestapo and KGB-type terrorism—in short a police state. Moreover, it would require forsaking the individual's inherent right to liberty guaranteed in our state constitution.[13] Of course, there may exist some rare situation where a legitimate government interest may override the individual's right. The principle we embrace, however, is one that reaches a rational compromise between such competing interests—one that does not exalt unlawful police authority over individual rights. For in the final analysis if our government is to be in fact what we continually proclaim it to be in theory—one of laws not men—the freedom to refuse to obey a patently unlawful order of a police officer and the freedom to resist his trespasses, his unlawful efforts to seize property and effect illegal arrests, is fundamental and must remain inviolate. Indeed, on an international political level and in a context differing only in degree, the United States government and its allies following World War II sponsored the concept that one has not only the right but the duty to resist, if not disobey, laws and orders that violate human rights bestowed by the universal law of nature. Thus, during the war crime trials at Nuremberg, citizens of the defeated axis nations were tried, convicted and punished for enforcing government laws and legal orders which the victors concluded involved the commission of criminal conduct violative of inherent natural rights of all men.

Here the facts indicate that resistance to the police invasion began when Mrs. Brown refused to consent to a warrantless search of her home and to the removal of either her Toyota or Cadillac. She specifically declined to move her Toyota and grabbed a wrecker driver in a bid to prevent his unlawful trespass on her car. For this she was arrested—another unlawful act which she unsuccessfully attempted to prevent by trying to free herself from the officers' grip.

The stipulated facts clearly establish liability of the defendants for their intentional tortious acts. Mrs. Brown's defiance of and interference with the wrecker driver's molestation of her car was not excessive. Though not joined as a party defendant, the wrecker man removed the cars at the wanton request of defendant City's police officers who were either incompetently ignorant of their legal authority or who knew that what they were doing was illegal and acted with outrageous maliciousness.

## IV

The summary judgment is vacated and the cause is remanded for further proceedings consistent with the foregoing opinion.

RAPP, J., concurs specially.

STUBBLEFIELD, J., dissents.

RAPP, Judge, specially concurring.

I join in the majority opinion. Even cleansed in the normal process of arriving at a stipulation, the stipulation itself still reveals a scenario which demands return to the trial court. This type of conduct within the curtilage, when the officers' presence is without right, invitation or consent, is impermissible.

Police officers are professionals. They are volunteers. They are individuals who have offered their services to assist other citizens of the community by upholding the law. They are more than mere enforcers of the peace. They are the bulwark of security which allows citizens to feel safe in their lives and homes. They are public servants. They are to be looked up to and admired. They are in many cases examples to be followed. The deliberate abuse and misuse of the office and assumption of

---

13. Okla. Const. art. 2, § 2. It reads:
    All persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry.

unauthorized power cannot be condoned. To allow or condone such a deviation or exercise of unauthorized power is to allow a breach in the Fourth Amendment shield protecting each of us against potential oppressive actions of government. It is to avoid such cracks and breaches in this shield that the courts are and have been ever vigilant.

The Supreme Court recognized the potential harm of such power in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 390, 91 S.Ct. 1999, 2001, 29 L.Ed.2d 619 (1971), when it stated:

> [T]he fact that power, once granted does not disappear like a magic gift when it is wrongfully used. An agent acting—albeit unconstitutionally—in the name of the United States of America possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own.

Further as the U.S. Supreme Court said in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), in prohibiting police from making a *warrantless* nonconsensual entry into a suspect's home in order to make a routine felony arrest:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

The court further stated 445 U.S. at 601, 100 S.Ct. at 1387:

> [N]either history nor this Nation's experience requires us to disregard the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.[54]

Footnote 54 states:

> There can be no doubt that Pitt's address in the House of Commons in March 1763 echoed and re-echoed throughout the Colonies:
> " 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!' " *Miller v. United States*, 357 U.S. [301,] at 307, 78 S.Ct. [1190,] at 1195 [, 2 L.Ed.2d 1332.]

Clearly and admittedly the police in this case had no legal authority to enter and search plaintiff's home and to seize her automobile. They did not have a search warrant or any other order of the court. The action occurred within the curtilage.[14] Any act therein is an act within the home. Any action within the home not authorized by law is per se unreasonable. The police conducted a *warrantless impermissible search* not only of the garage but also of a Toyota vehicle not remotely involved. This was unreasonable, *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). There were no exigent circumstances that justified crossing the threshold, *Payton*. The police were determined to exercise power and did. These officers were not on a lawful mission. They did, after arrival, exercise unauthorized, unlawful, raw, naked power.

Brown had the right to resist this unlawful intrusion into her home. She and her children had done nothing wrong. As stated by the U.S. Supreme Court in *Frank v. State of Maryland*, 359 U.S. 360, 364, 79 S.Ct. 804, 807, 3 L.Ed.2d 877 (1959) (reversed on other grounds):

> [T]wo protections emerge from the broad constitutional proscription of official invasion. The first of these is the right to be secure from intrusion into personal privacy, the right to shut the door on officials of the state unless their entry is under proper authority of law. The second, and intimately related protection, is self-protection: the right to resist unauthorized entry which has as its design the securing of information to fortify the coercive power of the state against the individual....

The dissent would hold this right of resistance to be an outdated rule of law—an

---

**14.** *See Luman v. State,* 629 P.2d 1275, 1276 (Okla.Crim.1981) where the court there stated:

> The curtilage area, historically considered as an extension of a man's house, has Fourth Amendment protection against unreasonable search and seizure. Curtilage includes all outbuildings used *in connection with a residence, such as garages,* sheds, barns, *yards and lots* connected with and in close vicinity of the residence.... (Emphasis added.)

anachronism—and justifies its rationale by the use of cases involving illegal search warrants. I do not quarrel with the dissent's rationale involving issued search warrants. One disobeys them at their peril. It is the function of the courts to determine their legality, if and when questioned. It would appear, in the final analysis, that the dissent would have us abandon a crucial right under the Constitution. I am not prepared to do this.

We are here concerned with the entry into the home *without* a search warrant. The fact in this case is that there was no search warrant, exigent circumstances, consent or invitation which justifies the officers' acts set forth in the stipulation.

For the above reasons I specially concur in the majority opinion.

STUBBLEFIELD, Judge, dissenting.

I dissent from the majority opinions for two reasons. The first is my adamant disagreement with the characterization of the actions of the officers as set out in the majority opinion. I do not believe the scant deposition evidence bears out the portrayal made by the majority. The record does indicate that one of the officers was the victim of an attack and that he reacted by attempting to restrain the plaintiff from her attack by holding her arm. The majority justifies the plaintiff's assault upon the officer as a proper and legal response to an unlawful seizure.[1] My disagreement with the application of the anachronistic rule of law that would permit such an uncalled for violent reaction constitutes the second ground for my dissent.

In considering whether to perpetuate what I believe to be an obsolescent rule of law, it is important to reflect upon the role of the modern day law officer and to compare the societal setting in which the outdated rule was applied with that of our modern world.

First of all, it is important to differentiate between the police officer and an individual acting without any authority of law. Policemen are, of course, vested with a societal purpose by mandate. They are charged to enforce our laws and to bring to justice those individuals who break them. They do not intrude into the lives of citizens for personal reasons. The confrontations resulting from a police officer's work are imposed upon him as a part of his duty. He is charged to enforce our laws and to keep the peace, and this latter responsibility generally means being thrust into situations where the peace is tenuous, at best, or already broken. In such situations, an officer must often make decisions of legal import without the benefit of leisurely reflection as have the writers of this decision. The officer of the law, in carrying out the societal duties delegated to him, must exercise his best judgment on the spot and then go on with his job, leaving the final judgment regarding the legality or correctness of his actions to be determined after the fact. That judgment may well be that the officer erred. It is inconceivable, however, that such a Monday morning determination could constitute ex post facto justification or legal excuse for violent resistance to the officer's actions. If such is the law then the law needs to be changed. Indeed, such changes have been made in many jurisdictions as modern societal circumstances have seemed to dictate.

The Arizona Supreme Court points out those changing circumstances and the resultant need for a change in the antiquated rule.

The common law rule allowing persons to resist unlawful arrest arose under circumstances significantly different from those existing today.

"The law of arrest by peace officers illustrates the discrepancy between law in the books and the law in action. The former not only antedates the modern police department, but was developed largely during a period when most arrests were made by private citizens, when bail for felonies was usually unattainable, and when years might pass before the royal judges arrived for jail delivery. Further, conditions in the English jails were then such that a prisoner had an excellent chance of dying of disease before trial. . . .

---

[1] The special concurring opinion seems to justify the attack upon the officer as a justifiable reaction to what it depicts as an illegal search. The scant evidence before us, however, clearly indicates the attack was occasioned by the officers' impoundment of the automobile. The record does not even clearly indicate whether the plaintiff had knowledge of the officers' entry into the garage to view the vehicle's license plate. In any event, I fail to see that such a "heinous" intrusion should subject the officer and private citizen involved to violence.

....

... The rule developed when long imprisonment, often without the opportunity of bail, 'goal [sic] fever,' physical torture, and other great dangers were to be apprehended from arrest, whether legal or illegal....

When the law of arrest developed, resistance to an arrest by a peace officer did not involve the serious dangers it does today. Constables and watchmen were armed only with staves and swords, and the person to be apprehended might successfully hold them off with his own weapon and thus escape." Warner, *The Uniform Arrest Act,* 28 Va.L.Rev. 315, 315, 330 (1942).

Moreover, the right to resist developed when the procedural safeguards which exist today were unknown.

"One who suffers the imposition of an unlawful police search has the assurance that any evidence so acquired is rendered inadmissible in a subsequent criminal trial by the exclusionary rule. Likewise any incriminating evidence obtained by exploiting an illegal arrest will be excluded in a subsequent criminal trial. [citation omitted]. And in any event damage remedies are available in the federal courts for violations of constitutional rights stemming from either an unlawful search or arrest." *United States ex rel. Kilheffer v. Plowfield,* 409 F.Supp. 677, 680–81 (E.D.Pa.1976).

*State v. Hatton,* 116 Ariz. 142, 568 P.2d 1040, 1045 (1977).

Numerous cases have held that there is no right to resist a search warrant later found to be illegal. *United States v. Woodring,* 536 F.2d 598 (5th Cir.1976), *cert. denied* 429 U.S. 1003, 97 S.Ct. 535, 50 L.Ed.2d 615 (1976); *United States v. Ferrone,* 438 F.2d 381 (3d Cir.1971), *cert. de-*

*nied,* 402 U.S. 1008, 91 S.Ct. 2188, 29 L.Ed.2d 430 (1971). Even though the judicial involvement in a search warrant is an added protection for the rights of the individual involved, the same policy considerations apply to the denial of the right of violent resistance to the acts of an officer engaged in the performance of his official duties. The officer engaged in the performance of his duties (as opposed to one engaging in a personal frolic of his own) is entitled to carry out his tasks without fear of violent resistance. Likewise the "victim" in our current society has too many legal remedies available for redress to permit, condone, or encourage physical "self-help" that is likely to result in injury or death. The matter was well stated by a New Jersey appellate court, which abrogated the common law right to resist illegal arrest:

Force begets force, and escalation into bloodshed is a frequent probability. The right or wrong of an arrest is often a matter of close debate as to which even lawyers and judges may differ. In this era of constantly expanding legal protections of the rights of the accused in criminal proceedings, one deeming himself illegally arrested can reasonably be asked to submit peaceably to arrest by a police officer, and to take recourse in his legal remedies for regaining his liberty and defending the ensuing prosecution against him. At the same time, police officers attempting in good faith, although mistakenly, to perform their duties in effecting an arrest should be relieved of the threat of physical harm at the hands of the arrestee.

*State v. Koonce,* 89 N.J.Super. 169, 183–184, 214 A.2d 428, 436 (1965).

Thus, the trend in this country has been away from the old rule and toward a resolution of disputes in court. Since *State v. Koonce,* ten additional states have adopted by judicial decision [2] and nineteen states by

---

**2.** *See Miller v. State,* 462 P.2d 421, 422 (Alaska 1969); *State v. Hatton,* 116 Ariz. 142, 147–148, 568 P.2d 1040, 1046 (1977); *State v. Richardson,* 95 Idaho 446, 451, 511 P.2d 263, 268 (1973), *cert. denied,* 414 U.S. 1163, 94 S.Ct. 928, 39 L.Ed.2d 117 (1974); *State v. Thomas,* 262 N.W.2d 607, 610–611 (Iowa 1978); *State v. Austin,* 381 A.2d 652, 655 (Me.1978); *In re Welfare of Burns,* 284

N.W.2d 359, 360 (Minn.1979); *State v. Nunes,* 546 S.W.2d 759, 762 (Mo.App.1977); *State v. Doe,* 92 N.M. 100, 102–103, 583 P.2d 464, 467 (1978); *Columbus v. Fraley,* 41 Ohio St.2d 173, 179–180, 324 N.E.2d 735, 740 *cert. denied,* 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975); *State v. Blaine,* 133 Vt. 345, 348, 341 A.2d 16, 18 (1975).

legislative enactment[3] the view that a person may not resist an unlawful arrest which is accomplished without excessive force. I see no reason why this rule should not also extend to prohibit violent reaction to an unlawful seizure.

Given the availability of reasonable bail, *Slack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 1 (1951), the right to appointment of counsel by the court, *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), and the right to a prompt judicial determination of probable cause following arrest, *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the arrestee who feels that the police have exceeded their authority is given fair assurance that the burdensome impact of any unlawful arrest will be minimized. The courts also provide speedy remedies for those who feel they have been illegally deprived of their property.

Consequently, it does not seem consistent with the needs of modern society to continue to rely upon an anachronistic doctrine that carries with it such a probability of harm to our private citizenry and law enforcement officers. I would, therefore, hold that, in the absence of excessive or unnecessary force by an arresting officer, a person does not have the right to forcefully resist arrest, search, or seizure by a law enforcement officer engaged in the performance of his duties even though such action on the part of the officer may be ultimately determined to be illegal. I believe as long as an officer's actions are not patently illegal or obviously outside the scope of his public office and authority, that the law should require citizen compliance with his official actions and demands and should abhor and prohibit violent resistance.

I believe such a conclusion would herein justify the police officer's actions in subduing and arresting the plaintiff and would require affirmance of the trial court.

---

**3.** *See* Ala.Code § 13A–3–28 (1982); Ark.Stat. Ann. § 41–512 (1977); Cal.Penal Code § 834a (Deering 1971); Colo.Rev.Stat. § 18–8–103(2) (1978); Conn.Gen.Stat. § 53a–23 (1981); Del. Code Ann. tit. 11, § 464(d) (1979); Fla.Stat. § 776.–051(1) (1976); Ill.Ann.Stat. ch. 38, § 7–7 (Smith-Hurd 1972); Iowa Code § 804.12 (1980); Mont.Code Ann. § 45–3–108 (1981); Neb.Rev. Stat. § 28–1409(2) (1979); N.H.Rev.Stat.Ann. § 594:5 (1974); N.Y. Penal Law § 35.27 (McKinney 1975); Or.Rev.Stat. § 161.260 (1981); 18 Pa.Cons.Stat.Ann. § 505(b)(1), (2) (Purdon 1973); R.I.Gen. Laws § 12–7–10 (1981); S.D. Comp.Laws Ann. § 22–11–5 (1978); Tex.Penal Code §§ 9.31(b)(2), 38.03 (Vernon 1974); Va. Code § 18.2–460 (1982). *See also* Ky.Rev.Stat. § 520.090 (1975); Model Penal Code § 3.04(2)(a)(i) (1974).