**David JURCO, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3382.**

Court of Appeals of Alaska.

Feb. 14, 1992.

---

David Jurco, pro se.

Joseph N. Levesque, Asst. Dist. Atty., Kenai, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

David Jurco was convicted, following a jury trial in district court, of disorderly conduct, AS 11.61.110(a)(6), and resisting arrest, AS 11.56.700(a)(1). These offenses resulted from a confrontation between Jurco and members of the State Troopers who had come to Jurco's residence to serve a court order directing them to take possession of Jurco's truck. The Kenai District Court had ordered seizure of the truck in connection with a civil action filed by the State seeking forfeiture of the vehicle because it had been used in furtherance of a violation of the fish and game laws.

Unbeknown to the troopers, Jurco had recently filed for bankruptcy. The federal bankruptcy court had directed Jurco not to sell or transfer any of his property or allow creditors to take any of his property without court order. Jurco believed that the

bankruptcy court's directive obliged him to resist the troopers' attempt to seize his truck. At first, Jurco argued with the troopers. Finding he could not dissuade them, Jurco got into the truck and started it. With Trooper Eugene Kallus trying to hang on to the side of the truck, Jurco drove the truck away to a different location on his property. Jurco then got out of the truck, removed the battery from the vehicle, and began to let the air out of the truck's tires.

At this point, Trooper Kallus informed Jurco that he was placing him under arrest for disorderly conduct. Kallus attempted to handcuff Jurco, but Jurco resisted; he broke free from Kallus's hold and ran into his house. Eventually, after Jurco spoke on the telephone with Kallus's superior officer, Jurco decided to come out of the house and surrender himself.

1. *Regardless of the Validity of the District Court's Order to Seize Jurco's Truck, Jurco Was Properly Convicted of Disorderly Conduct and Resisting Arrest*

Jurco argues that the criminal prosecution against him should have been dismissed under the supremacy clause of the United States Constitution (Art. VI, clause 2). He asserts that, because he had filed for bankruptcy, the Alaska District Court lacked power either to order forfeiture of his truck or to issue a warrant for its seizure.

But even if we assume for purposes of argument that Jurco's interpretation of bankruptcy law is correct, the question remains whether Jurco was entitled to forcibly resist the troopers when they came to execute the Kenai District Court's warrant. We conclude that Jurco was not entitled to forcibly resist the troopers even if he reasonably believed that the seizure of his truck was illegal.

As a preliminary matter, even if Jurco were legally entitled to forcibly resist the troopers' taking of his truck—so that his attempts to thwart this taking did not constitute the crime of disorderly conduct—Jurco would still be properly charged

with resisting arrest. As will be discussed in more detail below, even if a person is being subjected to unlawful arrest by police officers, Alaska law does not allow that person to use force to resist the arrest (so long as the officers do not use excessive force in making the arrest). AS 11.81.400(a). Once the troopers undertook to arrest Jurco for disorderly conduct, Jurco was obliged not to resist this arrest even if the disorderly conduct charge was invalid. Thus, Jurco's claim that he was entitled to forcibly resist the taking of the truck calls into question only his conviction for disorderly conduct, not his conviction for resisting arrest.

Jurco was charged with disorderly conduct under AS 11.61.110(a)(6), the provision of the statute which forbids a person from "recklessly [creating] a hazardous condition for others by an act which has no legal justification or excuse". The State argued that Jurco had put Trooper Kallus at risk when he drove the truck across the property. Jurco responded that his obstruction of the troopers was legally justified or excused because he acted under a reasonable belief that the Kenai District Court (and thus the officers executing that court's order) had no authority to seize his truck.

At common law, a public officer was authorized to use reasonable force against other persons when executing a court order requiring or authorizing the officer to seize another person's property. *LaFave and Scott, Substantive Criminal Law* (1986), § 5.5(a), Vol. 1 at 641. This common-law rule has been codified in Alaska; AS 11.81.420 provides:

*Justification: Performance of public duty.*

(a) Unless inconsistent with AS 11.81.320—11.81.410, conduct which would otherwise constitute an offense is justified when it is required or authorized by law or by a judicial decree, judgment, or order.

(b) The justification afforded by this section also applies when ... the person reasonably believes the conduct to be required or authorized by a decree, judg-

ment, or order of a court of competent jurisdiction or in the lawful execution of legal process, notwithstanding lack of jurisdiction of the court or defect in the legal process[.]

Under this statute, law enforcement officers are empowered to use force to execute court decrees, even if it is later shown that the court had no authority to issue the decree. Thus, in Jurco's case, the State Troopers were authorized to use all reasonable force to execute the Alaska District Court's order to seize Jurco's vehicle, even if Jurco was correct in claiming that the pendency of his bankruptcy petition deprived the state district court of the judicial authority to issue orders affecting his property.

However, the common law also recognized a principle that is seemingly in contradiction to the rule just discussed: a property owner was entitled to use force to resist an unlawful taking of his property. "One whose lawful possession of property is threatened by the unlawful conduct of another, and who has no time to resort to the law for its protection, may take reasonable steps, including the use of force, to prevent or terminate such interference with the property." *LaFave and Scott, Substantive Criminal Law*, § 5.9(a), Vol. 1 at 668. This second common-law rule has also been codified in Alaska; AS 11.81.-350(a) provides:

> *Justification: Use of force in defense of property and premises.*
>
> (a) A person may use nondeadly force upon another when and to the extent the person reasonably believes it is necessary to terminate what the person reasonably believes to be the commission or attempted commission by the other of an unlawful taking or damaging of property or services.

For purposes of deciding this appeal, we assume that Jurco reasonably believed that the Kenai District Court's order to seize his truck ran afoul of the federal bankruptcy court's order to keep his property together. In such a situation, the joint operation of AS 11.81.420 and 11.81.350(a) would seemingly allow Jurco to use force against the troopers to resist the taking of his truck while at the same time authorizing the troopers to respond with force of their own against Jurco—creating an escalating confrontation that would end only when the troopers resorted to deadly force against Jurco. (The statute allowing Jurco to use force, AS 11.81.350(a), authorizes only the use of "nondeadly force", while the statute allowing the troopers to use force, AS 11.-81.420, contains no such limitation.)

This could not have been the legislature's intention. With emotions running high on both sides, a property owner who sees that non-deadly force is not enough to make law enforcement officials back down might well begin (unlawfully) to use deadly force on the officers. Or, in the heat of the moment, the officers might mistakenly conclude that the property owner has begun to use deadly force upon them and respond in kind. Both possibilities could easily lead to the infliction of serious injury or death.

■ Thus, the question presented by Jurco's case is: which of these two statutes did the legislature intend to take precedence when law enforcement officers attempt to execute a court order calling for the seizure of property? We conclude that a person is not entitled to use force to resist the taking of property by law enforcement officers pursuant to a court order.

When the Alaska legislature enacted the present criminal code in 1978, modern common law had already taken the position that a person did not have the right to forcibly resist police officers performing their duty (unless the officers used excessive force). For instance, courts had restricted a citizen's right to use force to resist an arguably illegal search. *United States v. Woodring*, 536 F.2d 598, 599–600 (5th Cir.1976); *United States v. Ferrone*, 438 F.2d 381, 389–390 (3rd Cir.1971); *State v. Doe*, 92 N.M. 100, 583 P.2d 464, 466–67 (1978); and *State v. Hatton*, 116 Ariz. 142, 568 P.2d 1040, 1045–46 (1977). *See also State v. Mattila*, 77 Or.App. 219, 712 P.2d 832 (1986) (there is no right to use force to

obstruct police officers serving a contested eviction notice).[1]

The major Alaska court decision on this subject is *Miller v. State*, 462 P.2d 421 (Alaska 1969). In *Miller*, the Supreme Court confronted—and rejected—the old common-law rule that entitled a person to use non-deadly force to resist a peaceable unlawful arrest:

> We feel that the legality of a peaceful arrest should be determined by courts of law and not through a trial by battle in the streets. It is not too much to ask that one believing himself unlawfully arrested should submit to the officer and thereafter seek his legal remedies in court. Such a rule helps to relieve the threat of physical harm to officers who in good faith but mistakenly perform an arrest, as well as to minimize harm to innocent bystanders. The old common law rule has little utility to recommend it under our conditions of life today.

*Miller v. State*, 462 P.2d at 427.

While *Miller* dealt with resistance to arrest, not resistance to the judicial seizure of property, attorneys and legislators could easily foresee the extension of the *Miller* rule to seizures of property. Under *Miller*, citizens having good reason to believe they were being unlawfully arrested were nevertheless obliged to submit peaceably to a deprivation of their personal liberty and await their day in court. The rule could hardly be different when, under a disputed court decree, a citizen was being deprived of a lesser interest—the possession of personal property.

The rule established in *Miller*, that a citizen was not entitled to use force to resist even an unlawful arrest, was the law in Alaska when the legislature began its consideration of a revised criminal code in the mid–1970's. The Criminal Code Revision Subcommission recommended retention and codification of the *Miller* rule. See Alaska Criminal Code Revision, Tentative Draft, Part 2 at 43 (proposed AS 11.-21.200) and at 66 (commentary). However,

the legislature specifically reinstated a citizen's right to forcibly resist an illegal arrest when it enacted the original version of AS 11.81.400, contained in section 10 of chapter 166, SLA 1978:

> *Justification: Use Of Force In Resisting Or Interfering With Arrest.*
>
> (a) A person may not use force to resist the arrest of himself ... by a peace officer who is known to him, or reasonably appears to be, a peace officer, whether the arrest is lawful or unlawful, unless ...
>
> (2) the person resisted the arrest of himself and
>
> (A) the arrest was unlawful;
>
> (B) the person knew the arrest to be unlawful; and
>
> (C) the person did not use deadly force in resisting the arrest.

The legislature did not include any similar provision in AS 11.81.350(a), the section dealing with defense of property, or in AS 11.81.420, the section authorizing police officers to use force to enforce court decrees.

Moreover, immediately following their reinstatement of the rule authorizing forceful resistance to an arrest, the legislature began to reconsider and recede from their decision. In 1980 (the first legislative session after the new criminal code took effect), the legislature voted to place the burden on the arrested person of proving that the resistance to the arrest was justified, and to have the trial judge, not the jury, decide the issue of the legality of the arrest. § 26 ch 102 SLA 1980. Two years later, the legislature returned to the position adopted by the supreme court in *Miller*, repealing all the portions of AS 11.81.-400 that authorized forceful resistance to a peaceable arrest. Ch 63 SLA 1982.

Thus, when a person believes he or she is being arrested unlawfully by an identified police officer, Alaska law requires that person to submit peaceably to the officer and wait to litigate the validity of the arrest in a court of law. The same beneficial policies underlying this rule apply with equal

---

**1.** These cases involved prosecutions under statutes making it unlawful for a person to obstruct public officers in the performance of their duties. The Alaska counterpart is AS 11.56.-720(a), "Refusing to assist a peace officer or judicial officer".

force when an identified police officer attempts to take possession of property pursuant to a court decree.

As the supreme court pointed out in *Miller*, society would be ill-served by a rule that allowed property owners to engage in combat with law enforcement officers whenever there was reason to doubt the validity of the court order carried by the officers. A rule allowing forcible resistance would achieve only a dubious social benefit, but it would certainly jeopardize the safety of police officers, property owners, and bystanders. To paraphrase the supreme court in *Miller*, the legality of a court order directing seizure of property should be determined by courts of law, not through trial by battle.

In fact, the Alaska Supreme Court recently indicated that the rule forbidding forcible resistance to law enforcement officers does indeed apply when personal property is at stake. In *Thompson v. Anderson*, 824 P.2d 712 (Alaska, 1992), the court ruled that a bailee of another person's property does not commit the tort of conversion when the bailee complies with a police demand to surrender the property to police custody—whether or not the police demand is lawful. The court stated, "[E]ven if the bailee suspects or knows that a police seizure is unlawful, ... [t]o require a bailee to resist a police demand to turn over property would be to promote public disorder and potentially violent confrontations." At 715.

As noted above, the Alaska legislature briefly reinstated the common law rule that allowed such battles between officers and private citizens who disputed the legality of an arrest. Soon, however, the legislature re-established the rule and policies announced in *Miller*. When the legislature modified AS 11.81.400 to make it conform to *Miller*, the legislature made no simultaneous change to either AS 11.81.350(a) or AS 11.81.420—thereby indicating that the 1978 criminal code had never been intended to confer a right of forcible resistance to court-ordered seizures of property.

This view of these two statutes is also supported by the fact that the Legislature has imposed an affirmative duty on citizens to assist police officers in the performance of their duties. AS 11.56.720(a) provides:

*Refusing to assist a peace officer or judicial officer.*

A person commits the offense of refusing to assist a peace officer or judicial officer if, upon a request, command, or order by someone the person knows to be a peace officer or judicial officer, that person fails to make a good faith effort to physically assist the officer in the exercise of official duties.

It would not make sense for the legislature to have meant AS 11.81.350(a) to authorize citizens to forcibly resist police efforts to enforce a court order for seizure of property while at the same time requiring those same citizens, under AS 11.56.720(a), to physically assist the officers once the officers had requested or commanded this assistance.

Our interpretation of AS 11.81.350(a) and AS 11.81.420 is also consonant with AS 12.35.040, governing the authority of police officers executing a search warrant. This statute provides:

In the execution or service of a search warrant, the officer has the same power and authority in all respects to break open any door or window, to use the necessary and proper means to overcome forcible resistance made to the officer, or to call any other person to the officer's aid as the officer has in the execution or service of a warrant of arrest.

For these reasons, we conclude that when a person is confronted by a police officer (1) who is known to be or reasonably appears to be a police officer, and (2) who is known to be or reasonably appears to be required or authorized to take possession of the person's property under a judicial decree, judgement, or order, that person must submit peaceably to the officer's taking of the property. If there is any question regarding either the validity of the court decree itself or the scope of the officer's seizure of property under the de-

cree, the owner or possessor of the property must wait to litigate that question in court.

It follows that Jurco was not entitled to forcibly resist the State Troopers' efforts to seize his truck under the order issued by the Kenai District Court. When he did so, and when his resistence created a hazardous condition for others, his actions formed a proper basis for a criminal charge of disorderly conduct. Our resolution of this issue also disposes of Jurco's claim that he was entitled to have the trial jury instructed to acquit him of disorderly conduct if they concluded that he had reasonably believed the Kenai District Court's order to be invalid.

### 2. The Troopers Could Arrest Jurco Without a Warrant

█ Jurco also argues that his arrest was illegal because the troopers did not have an arrest warrant. Jurco acknowledges that AS 12.25.030 authorizes police officers to arrest without a warrant when a misdemeanor is committed in their presence, but he claims that this statutory authority is limited by AS 12.25.180(a), which provides:

> When a person is stopped or contacted by a peace officer for the commission of a misdemeanor or the violation of a municipal ordinance, the person may, in the discretion of the contacting peace officer, be issued a citation instead of being [arrested], unless
>
>   (1) the person does not furnish satisfactory evidence of identity;
>
>   (2) the contacting officer has reasonable and probable cause to believe the person is a danger to self or others;
>
>   (3) the crime for which the person is contacted is one involving violence or harm to another person or to property; or
>
>   (4) the person asks to be taken before a judge or magistrate under AS 12.25.150.

Jurco has misread this statute. AS 12.25.180(a) authorizes a police officer to issue a citation to a misdemeanor offender in lieu of making an arrest, unless one of the four enumerated exceptions applies. But the statute does not require a police officer to follow this course.

Additionally, the facts of Jurco's case appear to fall within the third exception listed in the statute. Because Jurco fought with Trooper Kallus and because Jurco was in the process of dismantling and disabling his truck when he was arrested, Jurco's crimes involved violence and harm to property. This being so, AS 12.25.180(a) would have prohibited Trooper Kallus from issuing Jurco a citation in lieu of arrest.

Finally, even if some additional justification were needed for the troopers' decision to make an arrest instead of issue a citation, that justification was present. It was clear that Jurco was intent on thwarting the troopers' performance of their duty under the court order directing seizure of Jurco's truck; the troopers could reasonably conclude that Jurco would continue to impede their efforts unless he were physically taken into custody.

### 3. Despite a Pre-trial Discovery Violation, Jurco Was Not Entitled to a Continuance of His Trial

Toward the end of the prosecution's case-in-chief, during Jurco's cross-examination of the State's final witness, Trooper Kallus, Jurco discovered that Kallus was referring to pages of a police report that Jurco did not have. The prosecuting attorney and Jurco conferred; it turned out that Jurco was missing ten pages of discovery materials. These ten pages comprised: Jurco's prior criminal record, three pages of a report filed by Kallus, a three-page report filed by Trooper Donna Edmond (a State's witness who had already testified), and a one-and-one-half-page synopsis prepared by Trooper JoAnna Roop of an interview she conducted with witness Thomas Ware (who likewise had already testified).

The parties vigorously debated whether the State had violated Alaska Criminal Rule 16 or whether Jurco had received and then lost the ten pages. The trial court eventually ruled that the State had, through oversight, failed to send the ten pages to Jurco.

The trial court gave Jurco an hour's continuance to examine the ten pages. When court was reconvened, the judge asked Jurco what he wished to do about this matter. Jurco announced that he was prepared to resume his interrupted cross-examination of Kallus, and that he then proposed to make his motion for judgment of acquittal (since Kallus was the final witness for the State). Jurco wished to reserve his right to seek a continuance of trial in the event the trial judge denied his motion for judgment of acquittal. The court agreed to Jurco's proposal.

Jurco finished his cross-examination of Kallus, then unsuccessfully moved for a judgment of acquittal. Immediately following the trial judge's denial of this motion, Jurco asked for a continuance of trial. His stated reason for seeking a continuance was that he was not a trained lawyer, this was his first criminal trial, and he felt he could not go forward without having more time to prepare. The trial judge responded that Jurco would have to be more specific.

Jurco then said he would be satisfied if he could re-call both Trooper Edmond and Thomas Ware as hostile witnesses during his defense case. Jurco claimed that Trooper Edmond's undisclosed report contained statements that were inconsistent with her trial testimony and that Trooper Roop's summary of her interview with Ware contained things that Ware had not said on the stand when he testified during the prosecution's case-in-chief.

The assistant district attorney announced he had no opposition to re-calling Trooper Edmond. With respect to re-calling Ware, the district attorney offered a counter-proposal: that Ware's entire tape-recorded interview with Trooper Roop, previously offered as Defense Exhibit A, would be stipulated into evidence, and that Trooper Roop would herself be made available as a defense witness.

Jurco initially indicated this was satisfactory, but then he decided to request a 60–day continuance. Jurco's only articulated reason for rejecting the proposal was that he did not know exactly what evidence he was missing—that he could not be sure what he did not have.

The prosecutor responded that no prejudice to the defense could possibly have arisen from Jurco's late receipt of the ten pages. The prosecutor pointed out that, after receiving the three pages of Kallus's report, Jurco had chosen to continue his cross-examination of Kallus rather than seek a continuance. Regarding the portions of the ten pages attributable to Trooper Edmond and Trooper Roop, both of these witnesses were still available to give testimony during the defense case— and the court had already ruled that they would be considered hostile witnesses, thus allowing Jurco to ask them leading questions. Moreover, Trooper Roop's synopsis of her tape-recorded interview with Ware was only that—a synopsis; Jurco had received a timely copy of the tape itself, containing Ware's complete statement.

The trial judge ruled that Jurco had failed to demonstrate any prejudice stemming from his late receipt of the ten pages. The judge also ruled that, since Jurco had already had one hour to examine the ten pages, and given the fact that Jurco would soon have the advantage of a long lunch break (apparently from 12:30 p.m. until 3:00 p.m.) to further examine the documents, Jurco would have plenty of time to discover any inconsistencies between previous witnesses' testimony and the version of events related in the ten pages. For these reasons, the court denied Jurco's request for a continuance.

■ The trial judge's ruling on Jurco's request for a continuance of trial was premised on the conception that it was Jurco's burden to demonstrate he had been prejudiced by the State's failure to make proper discovery. This allocation of the burden of proof was explicitly rejected by the supreme court in *Bostic v. State*, 805 P.2d 344 (Alaska 1991). In *Bostic*, the court held that, at least in the context of mid-trial discovery violations, it is the government's burden to disprove prejudice rather than the defendant's burden to establish it. *Id.* at 348–49.

However, the trial judge's error in placing the burden of proof on the wrong party makes no difference to the outcome here. Even though the government bears the burden of proof under *Bostic*, the defendant must set forth a plausible way in which his or her defense could be prejudiced by the government's failure to make timely disclosure. Jurco's request for a continuance of trial was ultimately grounded on his claim that the evidentiary concessions discussed above were inadequate to protect his right to a fair trial. But, as noted by the trial judge, Jurco failed to articulate any specific way in which he would remain prejudiced after receiving the favorable treatment offered by the court and the prosecutor.

Jurco's only assertions were (1) that he was not trained as an attorney and he therefore felt uncomfortable proceeding with the trial, and (2) that he could not be sure what evidence he was missing. Neither of these assertions is sufficient to warrant a continuance.

When Jurco chose to represent himself at trial, he took on the burden of conducting the trial without formal legal training. Jurco told the trial court that, from his one-hour examination of the late-disclosed police reports, the inconsistencies between the police reports and the various witnesses' previous testimony were clear to him. This being so, Jurco was not entitled to two months to decide how best to cross-examine the witnesses with the police reports.

As to Jurco's assertion that he could not be sure exactly what evidence he was missing, the trial court found that, given Jurco's familiarity with the case and the disclosure already made, Jurco could digest the contents of the ten new pages in the three hours available to him. Jurco never disputed the sufficiency of the three hours later in the trial.

Thus, even viewing the record in the light most favorable to Jurco—that is, employing a summary judgment standard of review because of the trial judge's misallocation of the burden of proof—Jurco's allegations of prejudice were insufficient to establish even a prima facie showing that his case had been damaged by the late disclosure of the ten pages. For this reason, we conclude that the trial judge's misallocation of the burden of proof was harmless error, and that Jurco was not entitled to a continuance of the trial.

*Conclusion*

The judgement of the district court is AFFIRMED.

BRYNER, Chief Judge, dissenting.

I disagree with the court's decision to affirm Jurco's disorderly conduct conviction. In my view, Jurco was entitled to an instruction on his theory of defense on this charge: that he was seeking to protect his property from what he reasonably believed to be an unlawful taking.

Under Alaska law, the right to use force in defense of property is expressly defined by statute. In AS 11.81.350(a), Alaska's legislature has explicitly authorized a person to "use nondeadly force upon another when and to the extent the person reasonably believes it is necessary to terminate what the person reasonably believes to be ... an unlawful taking ... of property...."

The majority of this court effectively amends the defense of property statute by engrafting to it an exception that the legislature evidently chose not to include. The court does so in reliance on its own notions of desirable social policy. It is not this court's prerogative, however, to substitute its political views for those expressed by the legislature in the clear and unrestricted language of AS 11.81.350(a).

The court attempts to justify its decision by reliance on *Miller v. State*, 462 P.2d 421, 426–27 (Alaska 1969). That case dealt with an individual's right to use force to resist an unlawful, but peaceable arrest by a police officer. When *Miller* was decided, no legislative enactment defined the right to use force in self-defense. Under the common law rule, applicable by default in the absence of controlling statute, individuals were allowed to defend themselves against unlawful arrests. The Alaska Su-

preme Court, however, noted a recent trend away from the traditional common law rule. Finding strong social policies supporting this trend, the court modified the common law rule and precluded the use of force in self-defense against a police officer attempting to make a peaceable arrest, regardless of the legality of the officer's conduct.

We no longer operate in a statutory void. The Alaska legislature has spoken, adopting a comprehensive statutory scheme that defines the extent to which force may be used in self-defense, as well as in defense of property. *See* AS 11.81.330 (use of nondeadly force in self-defense); AS 11.81.335 (use of deadly force in self-defense); AS 11.81.340 (use of force in defense of a third person); AS 11.81.350 (use of force in defense of property and premises); AS 11.81.-400 (use of force in resisting or interfering with arrest).

As an integral part of this scheme, the legislature has adopted a specific statutory provision that embodies the rule adopted in *Miller*, precluding the use of self-defense against a police officer who attempts to make a peaceable but unlawful arrest. *See* AS 11.81.400. In contrast to this limitation on the use of force against a police officer in self-defense, the legislature has notably omitted any comparable restriction on the permissible use of force to prevent the unlawful taking of property by an officer.

Given the legislature's enactment of a comprehensive scheme regulating permissible use of force in defense of both persons and property, its inclusion in that scheme of a restriction against use of self-defense against police officers, and its omission of any comparable restriction for use of force in defense of property, this court is no longer free, as was the supreme court in *Miller*, to modify the law simply because we believe it is a good idea. Nor are we free to modify the law simply because we believe the legislature may have acted unwisely.

We may not simply assume that the legislature acted in ignorance in failing to include additional limitations in AS 11.81.-350(a). Absent compelling evidence to the contrary, we must presume that the legislature knew what it wanted and that its enactments accurately reflect its intent. Yet there is no indication here—let alone any compelling evidence—that the legislature's failure to limit the defense of property statute was inadvertent or the product of misdirection or miscalculation.

The legislature was fully aware of *Miller* when it enacted the current statutory scheme. As pointed out in the majority opinion, the legislature initially declined to follow *Miller*, omitting restrictions both as to self-defense and defense of property. It ultimately elected to adopt *Miller*'s restrictions on self-defense. Had the legislature wanted to take the same course of action with respect to the right to use force in defense of property, it could have, and presumably would have done so.[1]

---

**1.** The majority opinion suggests that the legislature may not have thought it necessary to enact a specific limitation to the defense of property provision because it believed that *Miller* modified the common law rule with regard to both self-defense and defense of property. The opinion posits that the legislature may have concluded that the courts, through application of the common law on a case-by-case basis, would preclude the use of force against police officers, both in cases of self-defense and defense of property. To explain why, under these circumstances, the legislature saw fit to adopt AS 11.-81.400, which expressly deals with use of force against an officer in self-defense, while neglecting any similar restriction as to defense of property, the majority theorizes that AS 11.81.400 was seen not as a limitation on the right to self-defense set out in AS 11.81.330 and .335, but rather as a necessary modification of the limita-

tion on self-defense adopted as a matter of common law in *Miller*. Thus, in the majority's view, in enacting AS 11.81.350(a), the legislature meant to leave intact the limitation on defense of property applicable via the common law, as modified by the supreme court in *Miller*.

This theory is untenable. *Miller* did not purport to deal with defense of property. It addressed only the issue of self-defense. The case did not decide, consider, or even mention defense of property. Moreover, the majority's theory ignores the basic nature of the current statutory scheme that defines use of force in self-defense, defense of property, and defense of others. The comprehensive nature of this legislation makes it apparent that the legislature meant to address this subject fully and did not merely intend to address specific issues not adequately covered by common law. In fact, if the majority view were correct in suggesting that

The presumption that the legislature knew what it was doing in omitting any exception from the defense of property statute would be overcome if the omission were irrational. But it is not. The majority opinion suggests that it makes no sense to apply the *Miller* rationale to self-defense without extending it to the defense of property. In fact, however, the two defenses are different and have historically been accorded disparate treatment.

Professor LaFave, for example, discusses the modern trend toward restricting the use of force in self-defense against an officer making a peaceable but unlawful arrest. *See* W.R. LaFave & A.W. Scott, *Substantive Criminal Law* § 5.7(h), at 663 (1986). LaFave makes no mention of any trend to apply similar restrictions to the defense of property. *See id.* at § 5.9. *See also* P.H. Robinson, *Criminal Law Defenses* §§ 131(e) & 134 (1984) (to the same effect as LaFave). Similarly, the Model Penal Code provision on the use of force in self-protection explicitly provides that use of force is not justified against a peace officer. Model Penal Code § 3.04(2)(a)(i) (1962). The code's provision on use of force for protection of property, however, while enumerating other limitations, contains no comparable prohibition. *Id.* at § 3.06(3).[2]

The majority opinion also suggests that, unless limited in the same way as the self-defense statute, the defense of property provision would necessarily undermine the rationale of *Miller*. This is simply incorrect.

the legislature was content with what it understood to be the common law rule of defense of property, as modified by *Miller*, then not only would it have been unnecessary to enact an exception to the common law rule, it would also have been unnecessary to enact the common law rule itself, which the legislature did in AS 11.81.350(a). For the legislature to have assumed, under these circumstances, that no statutory limits to the defense of property were needed because the courts could be counted on to apply *Miller* in defense of property cases would have evinced a virtually unprecedented degree of faith by the legislature in the judiciary.

*Miller*'s primary concern was the inherent potential for mutually escalating violence arising from the conflict between an officer's right to use all force reasonably necessary to effect an arrest and the individual's common law right to use all force reasonably necessary to defend against an unlawful arrest:

> Because officers will normally overcome resistance with necessary force, the danger of escalating violence between the officer and the arrestee is great. What begins as an illegal misdemeanor arrest may culminate in serious bodily harm or death.

*Miller*, 462 P.2d at 426. No similar concern arises in the context of use of force to defend property.

To begin with, the right to use force in defense of property, as set forth in AS 11.81.350(a), has been carefully circumscribed: except in cases of arson and burglary, only nondeadly force may be used to defend property. This limitation in itself greatly reduces the potential that, in any given situation, violence might escalate to the point of death or serious bodily harm.

Even more significant is the relationship between the defense of property statute and the restriction against the use of force to defend against an unlawful arrest, as set forth in AS 11.81.400—a relationship that the legislature was certainly aware of when it decided the extent to which a person could permissibly use force in defense of property. An officer who is authorized to seize the property of another person, or who reasonably believes that such authority exists, will always be empowered to

2. It is interesting to note, in this regard, that the supreme court of Connecticut has explicitly recognized and upheld an individual's common law right to resist the unlawful police entry of a residence to make an arrest, even though the court acknowledged that, under state law, the individual was precluded from resisting the unlawful arrest itself. *See State v. Gallagher*, 191 Conn. 433, 465 A.2d 323, 328 (1983). The Connecticut Supreme Court's willingness to give separate consideration and disparate treatment to self-defense and defense of property in this context hardly supports the conclusion that the Alaska legislature's failure to adopt statutes treating the two defenses identically was irrational.

order the other person to refrain from any act impeding the seizure. Upon the issuance of such an order, the person would have a legal duty to obey. *See* AS 11.56.-720(a). Any resistance from the person that created a hazardous condition for the officer would provide grounds for an arrest for disorderly conduct, a class B misdemeanor. *See* AS 11.61.110(6). Resistance to the seizure by word or conduct that placed the officer in fear of imminent physical injury would provide grounds for arrest for the more serious misdemeanor of fourth-degree assault. AS 11.41.230(a)(3). Once placed under arrest, the person's right to use any further force against the officer would immediately be extinguished under AS 11.81.400, regardless of whether the person believed the officer to be acting lawfully or unlawfully.

Thus, given the statutory restriction against use of force to defend against an unlawful arrest, police officers already have the ability to avoid the potential for the type of escalating violence that was the root of the court's concern in *Miller*. The addition of similar restrictions to the defense of property provision is simply unnecessary to achieve this goal.

Jurco's case provides an excellent illustration of the point. When Jurco resisted the seizure of his truck by conduct that Trooper Kallus believed created a hazardous condition, Kallus placed him under arrest for disorderly conduct. At that point, AS 11.81.400 cut off Jurco's right to use any force against Kallus. Jurco's decision to persist in his resistance subjected him to conviction for resisting arrest, regardless of the lawfulness or unlawfulness of Kallus' efforts to seize Jurco's property or to make the ensuing arrest.

The only realistic potential for escalating violence under these circumstances was the potential arising from Jurco's decision to continue resisting Kallus' attempt to arrest him. Yet this is precisely the same potential for violence that will exist in any situation in which a person chooses to act in defiance of the law. It has no connection

to and could not be eliminated or reduced by redefining the right to defend property.

I do not mean to suggest that the defense of property statute, as currently written, is more desirable than it would have been had the legislature restricted it in the same way as it restricted the self-defense statute. My sole point is that the statute in its present form, without a judicially-engrafted exception, is not irrational. Because it is not irrational, it is the legislature's prerogative, not this court's, to decide whether it ought to be changed as a matter of public policy.

Since Jurco was given no defense of property instruction, I would reverse his disorderly conduct conviction.[3]

---

3. I agree with the majority's resolution of the remaining issues in this case.