George JACKO, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–6920.

Court of Appeals of Alaska.

June 18, 1999.

---

Patrick M. Anderson, Hedland, Brennan, Heideman, & Cooke, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

* Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Before COATS, Chief Judge,
MANNHEIMER, Judge, and
RABINOWITZ, Senior Supreme Court
Justice.*

## OPINION

MANNHEIMER, Judge.

George Jacko, Jr., appeals his conviction for violating a domestic violence protective order.[1] He contends that the district court should have dismissed this charge once it was determined (in retrospect) that the district court never should have issued the domestic violence protective order in the first place. But as explained in more detail below, even though a person may rightly believe that a court made a mistake of fact or law when it issued a restraining order, the person to whom the restraining order is directed must obey the order until the person convinces the issuing court (or a higher court) to reverse or vacate the order. Thus, even though the restraining order against Jacko was issued in error, Jacko was not at liberty to violate the order, and he could properly be charged (and convicted) under AS 11.56.740(a).

On September 3, 1997, Sarah Thiele petitioned the district court to issue a restraining order against Jacko. Thiele believed that Jacko was attempting to initiate a romantic relationship with her 16–year–old daughter, and she wanted the court to prohibit Jacko from pursuing this relationship.

At the *ex parte* hearing on her petition, Thiele told District Court Judge M. Francis Neville that she and Jacko were second cousins. She had directed Jacko to stay away from her daughter, but Jacko persisted in contacting the child. According to Thiele, Jacko frequently called Thiele's daughter on the telephone, and the ensuing conversations sometimes lasted for hours. Jacko also mailed items to Thiele's daughter. Moreover, Thiele told the court that someone had been making late-night telephone calls to her residence approximately every other night for the two weeks preceding the hearing.

1. AS 11.56.740(a).

Judge Neville granted Thiele's petition and issued a domestic violence restraining order against Jacko under AS 18.66.110. As the factual predicates for this restraining order, Judge Neville found probable cause to believe (1) that Jacko and Thiele were related within the fourth degree of consanguinity, and (2) that Jacko had committed an act of domestic violence against Thiele—specifically, harassment by telephone as defined in AS 11.61.120(a)(2)-(4).[2]

One of the provisions of this restraining order directed Jacko to stay away from Thiele's residence. Another provision barred Jacko from being in Thiele's daughter's presence.

Jacko was served with this order in the late afternoon of September 5, 1997. A police officer explained the terms of the order to Jacko, and Jacko acknowledged that he knew who Thiele's daughter was and that he knew where the Thieles lived.

Less than three hours later, Jacko drove up to the Thiele residence. Thiele's daughter and two of her friends were standing outside, and they saw Jacko (who was within 75 feet of the house). When Jacko pulled his car to within 20 feet of Thiele's daughter, the three girls ran inside the house and alerted Sarah Thiele. Thiele then notified the police. Jacko was arrested a short time later, after he admitted driving down the street where the Thiele residence is located.

Two weeks later, after Jacko had been charged with violating the restraining order, Jacko asked Judge Neville to vacate the order. He asserted (and proved) that he and Thiele were not related within four degrees of consanguinity, but rather five. (As noted above, Thiele originally told Judge Neville that she and Jacko were second cousins— which would place them in the sixth degree of consanguinity. In fact, Jacko and Thiele are first cousins once removed—the fifth degree of consanguinity.) Based on Jacko's proof, and because AS 18.66.990(5)(E) only authorizes a restraining order when the petitioner and the respondent are related within four degrees of consanguinity, Judge Neville vacated the restraining order.

After successfully petitioning Judge Neville to vacate the restraining order, Jacko asked Superior Court Jonathan H. Link to dismiss the criminal charge. Jacko asserted that, because everyone now conceded that the restraining order should never have been issued, Jacko could not properly be charged with a criminal offense for violating the order. Judge Link refused to dismiss the charge, and Jacko was ultimately convicted (following a jury trial).

On appeal, Jacko renews his argument that the charge against him should have been dismissed before trial. Jacko points out that Sarah Thiele told the court that she and Jacko were second cousins. Based on this, Jacko argues that it should have been obvious to Judge Neville that Thiele had failed to prove that she and Jacko were related within four degrees of consanguinity. Therefore, Jacko contends, the restraining order was "void" and he could violate the order with impunity.

■ This is incorrect. Even though a court's restraining order or injunction may be factually unjustified (even obviously factually unjustified, as was the case here), the persons subject to that order must nevertheless obey it until the order is vacated or reversed through process of law. That was the holding of this court in *Weidner v. State*[3] and of the United States Supreme Court in *United States v. United Mine Workers of America*[4].

■ This doctrine—that a person must obey a court order until it is reversed or vacated by judicial decision—is similar to the rule that a person may not use force to resist an unlawful but peaceable arrest[5] nor use force to resist the seizure of property under

---

**2.** See AS 18.66.990(3)(H) and (5)(E), respectively defining "domestic violence" and "household member" for purposes of construing the laws authorizing the courts to issue domestic violence restraining orders.

**3.** 764 P.2d 717, 721 (Alaska App.1988).

**4.** 330 U.S. 258, 293–94, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947).

**5.** See *Miller v. State*, 462 P.2d 421, 426–27 (Alaska 1969).

an unlawful court order[6]. Judge Learned Hand, speaking of the rule that a person may not forcibly resist an unlawful arrest, declared:

> The idea that you may resist peaceful arrest ... because you are in debate about whether it is lawful or not, instead of going to the authorities which can determine [this question] ... [is] not a blow for liberty but[,] on the contrary, a blow for attempted anarchy.

*Miller*, 462 P.2d at 427 (quoting 1958 Proceedings of the American Law Institute, p. 254).

We give the same answer to Jacko's contention that a person may flout a court order with impunity if it later turns out that the order was illegal. Such a rule would foster disorder and violence. We reaffirm our holding in *Weidner*: a person is obliged to obey a restraining order—even an illegal one—until, through judicial process, the order is vacated or reversed.

In *United Mine Workers*, the United States Supreme Court recognized an exception for situations in which the issuing court either lacked personal jurisdiction over the person ostensibly subject to the order or lacked subject-matter jurisdiction to issue the type of order in question.[7] But Jacko's case involves neither of these exceptions. Jacko was present in Alaska and was therefore subject to the personal jurisdiction of the district court.[8] And, under AS 18.66.100–110, the district court is authorized (that is, the court has subject-matter jurisdiction) to issue domestic violence restraining orders such as the one issued in Jacko's case.

Jacko raises an alternative argument based on dictum that appears in *Walker v. City of Birmingham*.[9] In *Walker*, the United States Supreme Court was asked to set aside the contempt convictions of people who decided to march in support of civil rights even though this would mean violating an injunction issued at the eleventh hour by a state court. The Supreme Court upheld the marchers' contempt convictions, noting that, "[w]ithout question", the court that issued the injunction had "jurisdiction over the petitioners and over the subject matter of the controversy".[10] The Supreme Court then added:

> [T]his is not a case where the injunction was transparently invalid or had only a frivolous pretense to validity. We have consistently recognized the strong interest of state and local governments in regulating the use of their streets and other public places. [citations omitted] When protest takes the form of mass demonstrations, parades, or picketing on public streets and sidewalks, the free passage of traffic and the prevention of public disorder and violence become important objects of legitimate state concern.

*Walker*, 388 U.S. at 315–16, 87 S.Ct. at 1829.

Jacko seizes on the first sentence of this quoted passage, the portion about injunctions that are "transparently invalid" or that have "only a frivolous pretense to validity". He claims that the restraining order issued against him was "transparently invalid" because Sarah Thiele's evidence plainly showed that she was not related to Jacko within the requisite four degrees of consanguinity.

But Jacko has taken the Supreme Court's words out of context. As can be seen in the quoted passage, after the Supreme Court adverts to injunctions that might be "transparently invalid" or that might have "only a frivolous pretense to validity", the Court then explains that it would extend facial validity to any injunction whose avowed purpose is to preserve the free use of public streets and sidewalks against the danger of disruption and disorder. In other words, when the Court speaks of "transparently invalid" injunctions, it is referring to the subject matter and general purpose of the injunction—not the particular facts of the case or the specific

---

**6.** *See Jurco v. State*, 825 P.2d 909, 913–15 (Alaska App.1992).

**7.** 330 U.S. at 291, 67 S.Ct. at 694–95.

**8.** *See* AS 22.15.070.

**9.** 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).

**10.** *Walker*, 388 U.S. at 315, 87 S.Ct. at 1829.

allegations that prompted the lower court to issue the injunction.

In Jacko's case, the challenged restraining order was issued for the purpose of preventing harassment of a mother and her minor daughter by one of their relatives. The state has a valid interest in preventing such conduct. Thus, the restraining order in this case does not violate the test suggested by the dictum in *Walker*.

■ For these reasons, we conclude that Jacko was properly charged under AS 11.56.740(a) for violating the domestic violence restraining order. Even though this restraining order was not supported by the evidence presented to Judge Neville, and even though Judge Neville ultimately vacated the restraining order for this very reason, Jacko was not free to violate the restraining order while it remained in effect.

Jacko raises one other challenge to his conviction, a challenge based on an evidentiary ruling made by his trial judge.

Before trial began, the prosecutor asked Judge Link to exclude any evidence or mention of the fact that the restraining order issued against Jacko was ultimately vacated. Jacko's attorney objected to this request. The defense attorney told Judge Link that he feared the jury would become unfairly prejudiced against Jacko if the jurors heard that a "domestic violence" restraining order had been issued against Jacko, without any explanation that the order was later vacated as being factually unfounded. The defense attorney suggested that, without this explanation, the jurors might unfairly conclude that Jacko had committed an act of violence.

Judge Link noted that, because Jacko could be convicted for violating an invalid restraining order, Judge Neville's later act of vacating the restraining order had no direct relevance to Jacko's trial. He did concede, however, that in all trials for violating a domestic violence protective order, the existence of the protective order would "create, or at least it has the potential to create, presumptions or prejudice by virtue of inferences that jurors may draw from the fact that it was issued." Judge Link characterized the issue as "one of [the] balancing acts"

required by Alaska Evidence Rule 403. He ultimately granted the State's request (that is, he barred any reference to the later invalidation of the restraining order), but he added that he would consider instructing the jury not to draw any inferences or assumptions from the existence of the restraining order.

Judge Link did, in fact, later instruct Jacko's jury that domestic violence restraining orders are generally issued "without notice to the respondent" and that, therefore, the respondent "cannot contest the allegations ... until later". Judge Link also expressly instructed the jury that "[t]he entry of the domestic violence order in this case is not to be interpreted by you as evidence that any domestic violence actually occurred."

On appeal, Jacko renews his argument that he should have been allowed to introduce evidence that Judge Neville later invalidated the restraining order. But we note that such testimony might have invited another form of prejudice—by suggesting to the jury that Jacko's actions were inconsequential and unworthy of legal attention.

We also note that Jacko's requested relief—the opportunity to explain that the restraining order was later vacated—does not necessarily cure the prejudice that his defense attorney was speaking of. Under the definitions contained in AS 18.66.990, a "domestic violence restraining order" may sometimes be validly issued even when there has been no act of "violence" as that term is normally understood—for instance, when a defendant engages in telephonic harassment, as alleged in this case. In such circumstances, the same unfair prejudice—the false inference that the defendant had committed an act of violence—might arise even in cases where the restraining order was undisputedly valid. The real source of potential prejudice is not the ultimate validity or invalidity of the restraining order, but rather the fact that the restraining order is termed a "domestic violence" restraining order.

■ After examining the record in Jacko's case, we are convinced that the jury was not prejudiced in the way Jacko suggests. First, Judge Link gave the curative instructions noted above. Second, none of the testimony

at Jacko's trial suggested that he had engaged in physical violence. Sarah Thiele explained to the jury that she had sought the restraining order to thwart Jacko's attempts to initiate a romantic relationship with her daughter.

Indeed, only one of the witnesses at Jacko's trial referred to the restraining order as a "domestic violence" order. Thiele herself referred to the restraining order as a "protective writ" or a "protective order". With one exception, the police officers uniformly referred to it as a "temporary restraining order" or "TRO". (The one exception occurred during the testimony of Officer Rosencrans; the prosecutor asked him about his general practice when serving "domestic violence writs", and Rosencrans did mention that he had received "a request for service of domestic violence documents".)

Given Judge Link's curative instructions, Sarah Thiele's explanation of the factual basis for the restraining order, and the paucity of references to "domestic violence" at Jacko's trial, we conclude that Judge Link did not abuse his discretion when he precluded Jacko from presenting evidence that Judge Neville later invalidated the restraining order that Jacko violated.

Jacko raises two arguments regarding his sentencing.

■ First, Jacko claims that it was error for Judge Link to allow the State to present information gleaned from a prior legislative investigation into Jacko's conduct with women. However, Jacko fails to brief this point in a meaningful way. The point is therefore waived.[11]

■ Second, Jacko claims that his sentence—365 days' imprisonment with 357 days suspended (8 days to serve)—is excessive. We do not have jurisdiction to decide this issue. Because Jacko received only 8 days to serve, he has no right to appeal his sentence, and this court has no jurisdiction to consider Jacko's claim that his sentence is excessive.[12] Jacko may, however, seek discretionary review of his sentence from the Alaska Supreme Court under Appellate Rule 215(a)(2).

Accordingly, we AFFIRM Jacko's conviction. And, having decided the issues in this appeal that lie within our jurisdiction, we now REFER Jacko's excessive sentence claim to the supreme court under Appellate Rule 215(k).

STEWART, Judge, not participating.

**11.** *See Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 410 (Alaska 1990) (when a claim is given only cursory treatment in a party's brief, the appellate court can deem the point waived and not consider it).

**12.** *See* AS 12.55.120(d); AS 22.07.020(c)(2).